UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

NADEEM ABUALTEEN,

                      Plaintiff,

      -against-

ANDREW A. SAUL,[1]
Commissioner of Social Security

                  Defendant.

------------------------------------------------

19cv2637 (DF)

**MEMORANDUM
AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

       In this Social Security action, which is before this Court on consent pursuant to 28 U.S.C.

§ 636(c), plaintiff Nadeem Abualteen ("Plaintiff") seeks review of the final decision of defendant

Nancy A. Berryhill, former Acting Commissioner of the SSA, succeeded by Andrew M. Saul

("Defendant" or the Commissioner"), denying Plaintiff Social Security Disability Insurance

("SSDI") benefits under Title II of the Social Security Act (the "Act"), on the ground that, for the

relevant period, Plaintiff's impairments did not constitute a disability under the Act.  Currently

before the Court is Plaintiff's motion, purportedly seeking summary judgment in his favor under

Rule 56(a) of the Federal Rules of Civil Procedure.  (Dkt. 11.)  Also before the Court is the

Commissioner's cross-motion, made pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for judgment on the pleadings affirming the Commissioner's decision.  (Dkt. 15.)  For

the reasons set forth below, Plaintiff's motion (Dkt. 11) is construed by the Court as a motion for

judgment on the pleadings in his favor, and, as such, it is granted to the extent it seeks remand

for further administrative proceedings.  Defendant's cross-motion (Dkt. 15) is denied.

---

[1] Andrew M. Saul having been appointed Commissioner of the Social Security
Administration ("SSA"), is substituted for Acting Commissioner Nancy A. Berryhill, pursuant to
Federal Rule of Civil Procedure 25(d).

## BACKGROUND[2]

Plaintiff filed an application for SSDI benefits on July 1, 2016,[3] alleging that he became

disabled as of June 6, 2015, as a result of injuries to his back, cervical spine, left shoulder, right

leg, and right foot.  (R. at 121-23, 131-34.)  After his claim was initially denied on August 26,

2016, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 86-87.)

At that time, Plaintiff exercised his right to appoint counsel to serve as his representative (*id.* at

108), and, in counsel's brief to the ALJ, Plaintiff requested that the ALJ adjudicate his claim for

a closed period of disability beginning on June 6, 2015 and ending on May 31, 2017 (the date

Plaintiff stopped receiving treatment).[4]  (*See id.* at 10.)  On May 15, 2018, Plaintiff, represented

by counsel, testified at a hearing held before ALJ Robert Gonzales (the "Hearing").  (*Id*. at 36-

---

[2] The background facts set forth herein are taken from the SSA Administrative Record (Dkt. 10) (referred to herein as "R." or the "Record").

[3] Although the ALJ wrote in his decision that Plaintiff filed his SSDI benefits application on June 30, 2016, the Record indicates that the application actually was filed on July 1, 2016. (R. at 121-23.)  This discrepancy appears inconsequential, as the parties agree that the relevant period for determining whether Plaintiff is entitled to SSDI benefits runs from June 6, 2015 (the alleged onset date of Plaintiff's disability), to May 31, 2017 (when he stopped receiving treatment).  (*See* Pl. Mem., at 4; Def. Mem., at 1.)

[4] "A closed period of disability refers to when a claimant is 'found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status.'"  *Corporan v. Comm'r of Social Sec.*, No. 12cv6704 (JPO) (SN), 2015 WL 321832, at *33 n.21 (S.D.N.Y. Jan. 23, 2015) (adopting report and recommendation) (quoting *Carbone v. Astrue*, 08 Civ. 2376, 2010 WL 3398960, at *13 n.12 (E.D.N.Y. Aug. 26, 2010)).

56.)  At the Hearing, the ALJ also heard testimony from Linda Stein, a vocational expert ("VE").

(*Id.* at 56-61.)

In a decision issued on August 2, 2018 (*id.* at 7-25), ALJ Gonzales found that, although

Plaintiff suffered from the severe impairments of cervical spine degenerative disc disease,[5]

lumbosacral degenerative disc disease,[6] thoracic degenerative disc disease,[7] left shoulder

impingement,[8] left lateral epicondylitis,[9] and post-traumatic headache disorder[10] (*id.* at 12), his

---

[5] Cervical degenerative disc disease is attributable to neck pain and most commonly occurs when "the patient is upright or moving the head."  As the cervical discs dehydrate, flexibility is reduced, and nerve compression occurs.  *Cervical Degenerative Disc Disease*, UCLA HEALTH, https://www.uclahealth.org/spinecenter/cervical-degenerative-disc-disease (accessed Aug. 2, 2020).

[6] Lumbosacral degenerative disc disease is a condition of the lumbar spine that affects the discs located in the lower back.  Over time, the discs "lose water content and shrink, and spurs often form as osteoarthritis develops."  *Lumbar Degenerative Disease*, U. OF MICH. MED., https://www.uofmhealth.org/conditions-treatments/cmc/back-neck-and-spine-conditions/lumbar-degenerative-disease (accessed July 24, 2020).

[7] Thoracic degenerative disc disease affects the thoracic spine – the area below the neck that connects to the ribs.  As the discs in the thoracic spine wear over time or the area is injured, the space between the discs is reduced thus reducing flexibility.  *Thoracic Disc Degeneration*, UCLA HEALTH, https://www.uclahealth.org/spinecenter/thoracic-disc-degeneration (accessed July 28, 2020).

[8] Shoulder impingement "is an injury to the muscles between bones in the shoulder area. . . . The symptoms . . . include:  difficulty reaching up behind the back[,] pain when the arms are extended above the head[, and] shoulder weakness."  *Impingement Syndrome of the Shoulder*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/7079-impingement-syndrome-of-the-shoulder (accessed Sept. 9, 2020).

[9] Lateral Epicondylitis, also known as "tennis elbow," occurs when tendons in the elbow swell due to either trauma or repeated stress.  Pain can extend from the elbow down to the wrist depending on the severity of the condition.  *Lateral Epicondylitis (Tennis Elbow)*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/lateral-epicondylitis-tennis-elbow (accessed July 30, 2020).

[10] "Posttraumatic headache (PTH) is a commonly occurring and potentially disabling consequence of concussion and mild traumatic brain injury (mTBI)."  Vargas, B. B., & Dodick,

impairments did not meet or equal the criteria of any impairment listed as disabling in the relevant regulations (*id*. at 12-13). The ALJ further found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain additional limitations, and, therefore, was not disabled under the Act. (*Id*. at 13, 21). Plaintiff, represented by counsel, then sought to appeal to the Appeals Council, submitting reasons why he disagreed with the ALJ's decision. (*Id.* at 112-15, 187-90.) On March 19, 2019, the Appeals Council denied Plaintiff's request for review, finding that his reasons for seeking review did not provide a basis for changing the ALJ's decision. (*Id*. at 1-6.) Thereafter, the ALJ's decision became the final decision of the Commissioner.

Through the same law firm that represented him at the Hearing and on his appeal to the Appeals Council, Plaintiff now challenges the Commissioner's denial of SSDI benefits, before the Court.[11]

### A.      Plaintiff's Personal and Employment History

In his application for SSDI benefits, Plaintiff stated that he was born on July 1, 1987, thus making him 27 years old as of his alleged disability onset date of June 6, 2015. (*Id.* at 118.) He reported that he had never been married and did not have children. (*Id*. at 118, 123.) At the Hearing, Plaintiff testified that he had completed two years of college and earned an Associate's Degree in Business and Management. (*Id.* at 39-40.) As to his housing, Plaintiff testified that he

---

D. W., *Posttraumatic headache*. CURRENT OPINION IN NEUROLOGY 25(3), 284-289, https://doi.org/10.1097/WCO.0b013e3283535bf5 (accessed Sept. 8, 2020).

[11] The Law Offices of Joseph A. Romano, P.C. has represented Plaintiff at all relevant times in connection with his claim. Cristina M. Lipan, Esq., who was an attorney at the firm, represented Plaintiff during the Hearing. Thereafter, Joseph A. Romano, Esq. represented Plaintiff before the Appeals Council and continues to represent him in this action.

lived with his parents, who were also financially supporting him because of his claimed inability to work.  (*Id*. at 40.)

According to the form "Disability Function Report" that he completed, Plaintiff worked at several jobs from 2006 through 2014.  (*Id.* at 136.)  In particular, he reported having worked at Cross County Multiplex Cinema (from 2006 to 2007), Best Buy (from 2007 to 2011), Command Security (from 2011 to 2013), and Saint Andrews Golf Course (in 2014).  (*Id.*)  In addition, Plaintiff reported that, from February 2015 through June 2015, he worked as a limousine driver, but, on June 2, 2015, while performing that job, he was involved in a car accident, which led to the onset of the injuries that served as the basis for his SSDI benefits application.  (*Id*. at 135; *see id.* at 45-46.)  Plaintiff testified that he stopped working as a limousine driver after the accident. (*Id.* at 40.)

## B.   Medical Evidence

As noted above (*see supra* at n.3), Plaintiff requested that the ALJ consider a closed period of disability, from June 6, 2015 (the alleged onset date of Plaintiff's disability) to May 31, 2017 (the date he stopped receiving medical treatment).  The Court will used that closed period as the relevant period of review for the purposes of Plaintiff's SSDI benefits application.[12]

### 1.   Hospital Records From the Date of the Accident

Although slightly preceding the relevant period, the Court notes that the Record contains documentation from the Franklin Hospital Emergency Department relating to Plaintiff's visit to

---

[12] As a general matter, to be eligible for SSDI benefits, a claimant must be "insured" for such benefits.  42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); *see also* 20 C.F.R. §§ 404.130, 404.315(a). Thus, in order to qualify for disability benefits, a claimant must establish that he became disabled on or before the expiration of his insured status.  *See, e.g., Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989); *see also Roman v. Colvin*, No. 13cv7284 (KBF), 2015 WL 4643136, at *1 n.2 (S.D.N.Y. Aug. 4, 2015) (Generally, "Title II [SSDI] benefits may be paid retroactively for up to 12 months prior to filing of an application.") (citing, *inter alia*, 20 C.F.R. § 404.621).

the hospital immediately after his car accident on June 2, 2015.  (*Id.* at 853-902.)   Plaintiff was taken to the hospital by ambulance, complaining of "sharp" pain in his lower back (*id.* at 854; *see id.* at 859 (noting that Plaintiff reported pain as a "9" on a 10-point scale)), as well pain in his neck (*id.* at 858).  According to the notes of radiologist Dr. Rathindra Banik, X-rays of Plaintiff's cervical spine and lumbosacral spine showed no acute fracture or subluxation.[13]  (*Id.* at 889-90.) Dr. Banik diagnosed Plaintiff with a cervical sprain and back contusion (*id.* at 867) and discharged him that same day with a prescription for Vicoprofen[14] and Robaxin[15] (*id.* at 868).

## 2.    Plaintiff's Treatment Records During the Relevant Period

The Record reflects that, during the relevant period, Plaintiff received treatment from two medical doctors:  an orthopedist and pain management specialist, Dr. David Dynof (*id.* at 796-843, 1074-149), and a doctor of osteopathic medicine, Dr. Douglas Schwartz (*id.* at 844-51). Plaintiff also received treatment from a doctor of chiropractic, Dr. Richard Harvey.  (*Id.* at 738-95, 917-90, 995-1064.)  The Court will summarize these providers' treatment notes, in turn.[16]

---

[13] Subluxation is defined as "[a]n incomplete luxation or dislocation." STEADMAN'S MEDICAL DICTIONARY 1716 (27th ed. 2000).

[14] Vicoprofen (Hydrocodone and Ibuprofen Combination) "is used to relieve acute pain severe enough to require opioid treatment and when other pain medicines did not work well enough or cannot be tolerated.  This medicine should only be used for short periods of time, usually for a total of less than 10 days." *Hydrocodone and Ibuprofen (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-ibuprofen-oral-route/description/drg-20062862 (accessed Sept. 9, 2020).

[15] Robaxin (Methocarbamol) "is used to relieve the discomfort caused by acute (short-term), painful muscle or bone conditions." *Methocarbamol (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/methocarbamol-oral-route/description/drg-20071962 (accessed Sept. 9, 2020).

[16] Even though Dr. Harvey was the first of these three providers to treat Plaintiff, the Court will nonetheless summarize these doctors' treatment records in the same order as the ALJ reviewed them in his decision, starting with the records of Dr. Dynof.

### a.     <u>**Treatment by Dr. Dynof**</u>

Plaintiff first met with Dr. Dynof on June 15, 2015 – around two weeks after the accident.  (*Id.* at 797.)  At that initial consultation, Plaintiff was asked to report his pain levels using a 10-point scale.  (*Id.*)  On this scale, Plaintiff reported experiencing pain at the level of "5" in his left elbow and right knee; "6" in his head, left shoulder, and left wrist; "7" in his upper back; "8" in his neck and middle back; and "10" in his lower back.  (*Id.*)  Plaintiff also reported that his pain increased at night and was prolonged when he was "standing, climbing stairs, lying down, [engaging in] activit[ies], walking, sitting[,] and walking down stairs."  (*Id.*)

Upon examination, Dr. Dynof found there was "severe tenderness to palpitation" at Plaintiff's cervical levels C3 to C7[17] in conjunction with muscle spasms and tenderness in the cervical paraspinal muscles.  (*Id.* at 798.)  With respect to Plaintiff's cervical spine, Dr. Dynof recorded that, on both the left and the right side, "trigger points [were] noted to palpitation to be severely tender"[18] in the paracervical and trapezial regions.  (*Id.*)  Also as to Plaintiff's cervical spine, Dr. Dynof recorded that Plaintiff had the following ranges of motion (as compared to the normal ranges):  flexion – 40/50; extension – 40/50; left rotation – 65/85; right rotation – 70/85; left flexion – 35/45; and right flexion – 30/45.  (*Id.*)  Next, as to Plaintiff's lumbosacral spine,

---

[17] "The cervical spine (neck region) consists of seven bones (C1-C7 vertebrae), which are separated from one another by intervertebral discs.  These discs allow the spine to move freely and act as shock absorbers during activity."  *Cervical Spine*, AMERICAN ASSOCIATION OF NEUROLOGICAL SURGEONS, https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Cervical-Spine (accessed Sept. 9, 2020).

[18] Trigger points are "discrete, focal, hyperirritable spots located in a taut band of skeletal muscle" that cause "persistent pain resulting in a decreased range of motion in the affected muscles," as well as "tension headache, tinnitus, temporomandibular joint pain, decreased range of motion in the legs, and low back pain."  David J. Alvarez & Pamela G. Rockwell, *Trigger Points: Diagnosis and Management*, 65 AMERICAN FAMILY PHYSICIAN 653, 653 (Feb. 2002).

Dr. Dynof noted that Plaintiff exhibited "severe tenderness" at levels L3 through S1.[19]  (*Id.* at

800.)  Further, for Plaintiff's lumbosacral spine, it was recorded that Plaintiff had the following

ranges of motion:  flexion – 75/90; extension – 15/25; left rotation – 30/45; right rotation –

30/45; left flexion – 15/25; and right flexion – 15/25.  (*Id.* at 800-01.)  Dr. Dynof also wrote that

"[t]he straight leg test [was] positive on the left and right eliciting low back pain[, and the]

Yeoman's test [was] positive" on both sides.[20]  (*Id.* at 800.)  As to Plaintiff's thoracic spine,

Dr. Dynof recorded that Plaintiff had "severe tenderness" at thoracic levels T1 to T10.[21]  (*Id.* at

799.)  Dr. Dynof also found that Plaintiff suffered from a left shoulder impingement, as Plaintiff

---

[19] "The lumbar spine comprises the lower end of the spinal column between the last thoracic vertebra (T12) and the first sacral vertebra (S1).  The spinal cord in this region has protection from five durable and mobile vertebrae (L1-L5) that allow for the dispersion of axial forces.  The spinal cord runs through the center of the vertebral column and terminates in the conus medullaris at the level of the L1-L2 vertebrae."  Sassack, Brett, Carrier, Jonathan D., *Anatomy, Back, Lumbar Spine*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.google.com/search?q=ncbi&rlz=1C1GCEB_enUS827US857&oq=ncbi&aqs=chrome..69i57l2j69i60l5.581j0j7&sourceid=chrome&ie=UTF-8 (accessed Sept. 9, 2020).

[20] "The straight leg raise test[,] also called the Lasegue test, is a fundamental neurological maneuver during the physical examination of the patient with lower back pain aimed to assess the sciatic compromise due to lumbosacral nerve root irritation."  Willhuber, Gaston O.C., Piuzzi, Nicolas S., *Straight Leg Raise Test*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION,https://www.ncbi.nlm.nih.gov/books/NBK539717/#:~:text=GO%2C%20Piuzzi%20NS.-,Introduction,was%20first%20described%20by%20Dr. (accessed Sept. 11, 2020).  In comparison, a Yeoman's test "measures pain in the sacroiliac joint."  *Mitchell v. Colvin*, 14-CV-00418A(F), 2016 WL 8674509, *4 (W.D.N.Y. Jun. 10, 2016), *report and recommendation adopted*, 2016 WL 6775300 (W.D.N.Y. 2016).

[21] "The thoracic region contains 12 vertebrae, denoted T1-T12."  Waxenbaum, Joshua A., Reddy, Vamsi, Futterman, Bennett, *Anatomy, Back, Thoracic Vertebrae*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi.nlm.nih.gov/books/NBK459153/ (accessed Sept. 9, 2020.)

had a positive Neer's test[22] and positive Hawkins test,[23] and a "strongly positive" abduction test. (*Id.*)  Lastly, Dr. Dynof found tenderness in Plaintiff's left elbow, along with a limited range of motion.  (*Id.*)

Based upon this initial consultation, Dr. Dynof concluded that Plaintiff suffered from: post-trauma headache; cervical sprain/strain, myalgia (muscle aches or pain), and trigger points; thoracic sprain, myalgia, and trigger points; lumbosacral sprain/strain, myalgia, and trigger points, along with right lumbar radiculopathy;[24] left shoulder pain and sprain/strain; left elbow and wrist strain; right and left sacroiliac pain/strain/sprain;[25] right knee pain/sprain; and left lateral epicondylitis.[26]  (*Id.* at 802-03.)

---

[22] The Neer's test is used to "identify impingement of the rotator cuff."  *Neer Test*, MEDICAL DICTIONARY, http://medical-dictionary.thefreedictionary.com/Neer+test (accessed Sept. 8, 2020).

[23] The Hawkins test assesses "rotator cuff tendonitis or subacromial impingement." *Mercado v. Colvin*, 15cv2283 (JCF), 2016 WL 3866587, at *4 (S.D.N.Y. July 13, 2016) (citing MEDICAL DICTIONARY (Farlex & Partners 2009), http://medical-dictionary.thefreedictionary.com/hawkins+test).

[24] Nerve radiculopathy can be exhibited by a range of symptom as a result of the pinching of a nerve root in the spinal column.  The pinched nerve at issue can occur at either the cervical, thoracic, or lumbar spine.  *Radiculopathy*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (accessed Aug. 4, 2020).

[25] The Sacroilliac joints "connect the pelvis to the spine through a strong set of ligaments."  *Sacroiliac Joint Dysfunction*, WEILL CORNELL BRAIN AND SPINE CENTER, https://weillcornellbrainandspine.org/condition/sacroiliac-joint-dysfunction (accessed Sept. 9, 2020).

[26] "Lateral epicondylitis 'is an inflammation of the tendons that join the forearm muscles on the outside of the elbow.'"  *Hayes v. Berryhill*, 17-CV-6354-FPG, 2018 WL 3069116, at *3 (W.D.N.Y. Jun. 21, 2018) (quoting ORTHOINFO, https://orthoinfo.aaos.org/en/diseases-conditions/tennis-elbow-lateral-epicondylitis/).

Dr. Dynof prescribed Flexeril[27] and Mobic[28] to Plaintiff, along with physical therapy.  (*Id.* at 803.)

Plaintiff met with Dr. Dynof for a follow-up visit on December 23, 2015.  (*Id.* at 804.) At that visit, Plaintiff reported experiencing less pain than he had felt at the prior visit; specifically, he reported the following pain levels:  neck – 5/10 (down from 8/10); lower back – 7/10 (down from 10/10); middle back – 0/10 (down from 8/10); upper back – 0/10 (down from 7/10); left shoulder – 4/10 (down from 6/10); left elbow – 3/10 (down from 5/10); left wrist – 4/10 (down from 6/10); and right knee – 2/10 (down from 5/10).  (*Id.*)  Upon examination, Dr. Dynof found that, for Plaintiff's cervical spine, there was moderate tenderness at cervical levels C3 to C7, in comparison to the severe tenderness previously found, but that Plaintiff's range of motion had generally remained the same, except for an improvement in his left rotation from 65/85 to 75/85.  (*Id.* at 805.)  As to Plaintiff's lumbosacral spine, Dr. Dynof wrote that Plaintiff was now exhibiting only moderate tenderness at levels L3 through S1.  (*Id.* at 807.)  He also recorded that Plaintiff's lumbosacral range of motion had remained largely the same, with some improvements in flexion (up to 80/90 from 75/90), left rotation (up to 35/45 from 30/45),

---

[27] Flexeril (Cyclobenzaprine) "is used to help relax certain muscles in your body.  It helps relieve pain, stiffness, and discomfort caused by strains, sprains, or injuries to your muscles. However, this medicine does not take the place of rest, exercise or physical therapy, or other treatment that [a] doctor may recommend for [a] medical problem.  Cyclobenzaprine acts on the central nervous system (CNS) to produce its muscle relaxant effects."  *Cyclobenzaprine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236 (accessed Sept. 8, 2020).

[28] Mobic (Meloxicam) "is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve the symptoms of arthritis (juvenile rheumatoid arthritis, osteoarthritis, and rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain.  However, this medicine does not cure arthritis and will only help [someone] as long as [that person] continue[s] to take it."  *Meloxicam (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (accessed Sept. 8, 2020).

and right rotation (up to 35/45 from 30/45).  (*Id.*)  Dr. Dynof also noted, however, that both the straight leg test and the Yeoman's test were again positive on both the left and right side.  (*Id.*)  With respect to Plaintiff's thoracic spine, Dr. Dynof found no tenderness at thoracic levels T1 to T12, which represented an improvement from the severe tenderness found in levels T1 through T10 during the prior visit.  (*Id.* at 805-06.)  At the same time, though, he recorded that Plaintiff again had a positive Neer's test and Hawkins test, as well as a positive abduction test as to his left shoulder.  (*Id.* at 806.)  Lastly, Dr. Dynof found tenderness in Plaintiff's left elbow, along with a limited range of motion.  (*Id.*)  Dr. Dynof's "impressions" of Plaintiff's physical conditions remained largely the same, except that, based on MRI studies and a nerve conduction study,[29] Dr. Dynof reported that he also found, *inter alia*, cervical disc bulge and herniation, left and right cervical radiculopathy, lumbar disc bulge and herniation, and left shoulder impingement.  (*Id.* at 809-10.)  Dr. Dynof continued to prescribe Flexeril and Mobic, along with physical therapy and chiropractic treatment.  Dr. Dynof also "stressed [to Plaintiff] the importance of a home exercise program including stretching to maintain range of motion and improve overall function."  (*Id.* at 810.)

In 2016, Plaintiff saw Dr. Dynof five times:  on February 3, March 14, April 25, May 4, and October 7.  (*Id.* at 812-35.)  During the February 3 visit, Plaintiff reported improvements in his pain levels.  (*Id.* at 812.)  Specifically, he reported feeling a decreased amount of pain in his neck – 4/10 (down from 5/10); lower back – 5/10 (down from 7/10); left shoulder – 2/10 (down from 4/10); left elbow – 2/10 (down from 3/10); left wrist – 2/10 (down from 4/10); and right

---

[29] On July 23, 2015, an EMG/NCV Upper (nerve conduction study) of Plaintiff was conducted; on July 27, 2015, two MRIs were taken, specifically of Plaintiff's lumbar spine and cervical spine; and, on December 23, 2015, an MRI was taken of Plaintiff's left shoulder.  The results from those imaging tests are all described at Page 809 of the Record and are referred to in relevant part below.  (*See* Background, *infra*, at Section B(2)(b).)

knee – 1/10 (down from 2/10).  (*Id*.)  Upon examination, Dr. Dynof wrote that Plaintiff

continued to exhibit moderate tenderness in his cervical spine at cervical levels C3 to C7, but

that he exhibited some improvement in his cervical range of motion.  (*Id*. at 813 (but also

recording that "[m]uscle spasm and tenderness [were] noted in the cervical paraspinal muscles"

on each side and that "trigger points" were noted to be "mildly tender in the paracervical and

trapezial regions" on both sides).)  Similarly, Dr. Dynof recorded that Plaintiff showed

improvement in his lumbosacral spine range of motion, but that he still also displayed moderate

tenderness in his lumbosacral levels L4 through S1, and that the straight leg test and Yeoman's

test were again positive on the left and right side.  (*Id*. at 815 (additionally recording that "[t]here

[was] pain reported with restricted range of motion in left rotation and right rotation").)  Further,

Dr. Dynof wrote that Plaintiff reportedly exhibited no tenderness at thoracic levels T1 to T12,

but that his left shoulder continued to demonstrate an impingement after another positive Neer's

test and a "mildly positive" abduction test.  (*Id*. at 814 (also finding tenderness in Plaintiff's left

shoulder).)  Dr. Dynof similarly found tenderness in Plaintiff's left elbow, with a limited range of

motion.  (*Id.*)  As a whole, Dr. Dynof's impressions remained the same, and he continued to

prescribe Flexeril and Mobic, along with physical therapy, chiropractic treatment, and home

exercise.  (*Id*. at 817-18.)

At their next visit on March 14, Plaintiff reported experiencing "moderate to severe lower

back pain" that increased when he stood for long periods of time; he also reported experiencing

increased pain in his left shoulder.  (*Id*. at 819 (noting that Plaintiff was going to physical therapy

and chiropractic care three times per week.)  Upon examination, Dr. Dynof documented that

Plaintiff continued to show moderate tenderness in his cervical spine, and that his cervical range

of motion had stayed consistent with his prior visit.  (*Id*. at 820.)  As to Plaintiff's lumbosacral

spine, Dr. Dynof recorded that there was moderate tenderness at levels L4 through S1 and that

his range of motion had largely remained the same.  (*Id*. at 822-23 (straight leg test and

Yeoman's test were positive for each side).)  Dr. Dynof further found that Plaintiff showed no

tenderness in his thoracic spine, but that he continued to suffer from an impingement in his left

shoulder.  (*Id*. at 821 (positive Neer's test and "strongly positive" abduction test).)  Dr. Dynof's

impressions of Plaintiff's conditions stayed the same, and he continued to prescribe Flexeril and

Mobic, in addition to physical therapy, chiropractic treatment, and home exercise.  (*Id*. at 824-

25.)

On April 25, Plaintiff reported to Dr. Dynof that he was experiencing decreased pain

levels in his neck and left shoulder.  (*Id*. at 827.)  Plaintiff also stated, however, that his lower

back was "very sore and throbbing and hurt[] all day long," and he estimated that his pain level

in his lower back was at a 7/10.  (*Id*.)  Upon examination, Dr. Dynof recorded that the tenderness

in Plaintiff's cervical spine had decreased from moderate to mild, while his range of motion had

slightly increased in two categories (left rotation from 75/85 to 80/85 and left flexion from 35/45

to 40/45).  (*Id*. at 828.)  At the same time, however, Dr. Dynof found that Plaintiff's lumbosacral

spine had exhibited an increase in tenderness from moderate to severe at levels L4 through S1,

and that there was "pain reported with restricted range of motion in left and right rotation."  (*Id*.

at 830 (straight leg test and Yeoman's test were positive on each side).)  Although Dr. Dynof

found that there was no tenderness in Plaintiff's thoracic spine at T1-T12, he continued to note

that Plaintiff showed signs of a left shoulder impingement after another positive Neer's test and

abduction test.  (*Id*. at 829.)  While his impressions again remained the same, Dr. Dynof did not

renew Plaintiff's prescriptions for Flexeril and Mobic and, instead, only recommended physical

therapy, chiropractic treatment, and home exercise.  (*Id*. at 833-34.)

Then, at Plaintiff's visit on May 4, Dr. Dynof gave Plaintiff lumbar paravertebral nerve block injections[30] to combat the pain in his lower back.  (*Id*. at 835 (recording that Plaintiff had "found minimal prolonged relief with conservative treatment" and had "significant myalgia in the lumbar region with moderately limited range of motion").)  Dr. Dynof wrote that Plaintiff "tolerated the procedure well" and "reported a significant relief of [his] back pain within 15 minutes after the procedure."  (*Id*.).

Plaintiff's last visit with Dr. Dynof in 2016 was on October 7 of that year.  (*Id*. at 836-43.)  At that visit, Plaintiff reported that he "experienced good relief with the prior lumbar facet injections," and that his pain level was now at a 3/10 in his lower back – an improvement from his last visit.  (*Id*. at 836.)  Plaintiff did, however, describe discomfort in his neck at a 9/10 pain level.  (*Id*.)  Upon examination, Dr. Dynof noted severe tenderness in Plaintiff's cervical spine from levels C4 to C7 and that his range of motion appeared to have worsened.  (*Id*. at 837.)  Dr. Dynof also recorded that Plaintiff exhibited mild tenderness in his lumbosacral spine, and that his range of motion had seen a slight improvement (extension went from 10/25 to 15/25, and left flexion went from 10/25 to 15/25).  (*Id*. at 839-40 (noting positive straight leg test and positive Yeoman's test).)  Moreover, Dr. Dynof wrote that Plaintiff continued to show no tenderness in his thoracic spine, but had again tested positive for a left shoulder impingement. (*Id.* at 838 (noting positive Neer's test and "strongly positive" abduction test).)  While maintaining the same impressions of Plaintiff's conditions, Dr. Dynof changed his treatment plan by also recommending that Plaintiff take Motrin every eight hours, in addition to physical

---

[30] Paravertebral nerve block injections, also knowns as "PVB," consist of an injection of anaesthetic in a space lateral to where the spinal nerves emerge.  *Cervical Degenerative Disc Paravertebral Block*, JOURN. OF ANAESTH, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3146159/ (accessed Aug. 3, 2020).

therapy, chiropractic treatment, and home exercise.  (*Id*. at 843 (writing that "further trigger point injections" would be scheduled if "symptoms persist[ed]").)

On May 19, 2017, Plaintiff again visited Dr. Dynof, and, at that appointment, Plaintiff reported "good relief" from the trigger point injections, but stated that he was still experiencing "severe lower back and neck pain" and that his back pain "radiate[d] down his knees."  (*Id.* at 1134 (Plaintiff reported being "uncomfortable [when] sitting for a long period of time.").)  Upon examination, Dr. Dynof noted that there was moderate tenderness in Plaintiff's cervical spine from levels C4 to C7, and that his cervical range of motion had slightly improved since his last visit.  (*Id*. at 1135.)  According to Dr. Dynof, Plaintiff was again exhibiting moderate tenderness in his lumbosacral spine and had another positive straight leg test, even though his lumbosacral range of motion had remained the same or even slightly improved.  (*Id*. at 1137 (also recording that "[t]here [was] pain reported with restricted range of motion in left rotation and right rotation").)  As to Plaintiff's thoracic spine, Dr. Dynof wrote that Plaintiff did not show any tenderness.  (*Id*. at 1136.)  Yet, Plaintiff again had a positive Neer's test and abduction test, demonstrating that he suffered from a left shoulder impingement.  (*Id*.)  During this visit, Dr. Dynof provided Plaintiff with cervical trigger point injections (*id.* at 1124), and recommended that Plaintiff continue to take Motrin every eight hours, as well as continue physical therapy, chiropractic treatment, and home exercise (*id*. at 1140).

One week later, on May 26, Dr. Dynof provided Plaintiff with lumbar paravertebral nerve block injections.  (*Id*. at 1125.)  Within 15 minutes of receiving the injections, Plaintiff "reported a significant relief of [his] back pain."  (*Id*.)

Plaintiff's final visit with Dr. Dynof was on June 7, 2017; during that visit, Plaintiff reported feeling "good relief" from the lumbar injections.  (*Id*. at 1142.)  Plaintiff, however, also

reported that his neck pain had worsened, and that he was experiencing "throbbing pain in [his] lower back." (*Id*.) Dr. Dynof again noted moderate tenderness in Plaintiff's cervical spine from levels C4 to C7. (*Id*. at 1143.) Further, Dr. Dynof found that Plaintiff's cervical range of motion had remained unchanged. (*Id*.) As to Plaintiff's lumbosacral spine, Dr. Dynof noted moderate tenderness and that Plaintiff's range of motion remained largely the same, other than a slight decrease in flexion. (*Id*. at 1145-46 (also recording that Plaintiff had a positive straight leg test and that trigger points on both sides of the lumbosacral spine were "moderately tender").) In addition, Dr. Dynof found that Plaintiff's thoracic spine continued to show no tenderness or swelling, but that another positive Neer's test and abduction test still showed a left shoulder impingement. (*Id*. at 1144.) Dr. Dynof's impressions remained the same, and he continued to recommend that Plaintiff take Motrin every eight hours as well as engage in physical therapy, chiropractic treatment, and home exercise. (*Id*. at 1140.)

Based on this final visit and a review of his notes from the prior two years, Dr. Dynof prepared a report regarding Plaintiff's conditions; in that report, Dr. Dynof opined "with a reasonable degree of medical certainty that [Plaintiff] ha[d] sustained a significant limitation in the use and function of his cervical and lumbar spine and ha[d] sustained a significant limitation in the use and function of his left shoulder and right knee." (*Id.* at 1132). Further, he opined that "there [was] a permanent loss of overall motion in [Plaintiff's] cervical and lumbar spine and [his] left shoulder and right knee." (*Id*. (also noting that it was "likely that exacerbation [would] occur in [Plaintiff's] future").) Dr. Dynof also opined that Plaintiff's injuries had a causal relationship with the car accident that had occurred on June 2, 2015, and he described Plaintiff's condition as remaining "guarded to poor." (*Id.* at 1133.)

### b.   __Treatment by Dr. Schwartz__

At the Hearing before the ALJ, Plaintiff testified that he had seen Dr. Schwartz, a

Physical Medicine & Rehabilitation Specialist, for "six to eight visits" (*id*. at 49), although the

Record only contains notes of two such visits – on October 1 and December 3, 2016 (*see id*. at

845-51).[31]   At his first visit with Dr. Schwartz for which there are available records, Plaintiff

reportedly stated that his daily activities consisted of "dressing/undressing his upper/lower

extremities, feeding, grooming, and personal hygiene." (*Id*. at 850 (also recording that Plaintiff

drove to the office).)  Plaintiff reported to Dr. Schwartz that he felt "persistent pain [in his] neck

and low[er] back mainly on the right side with episodes of referred pain, numbness[,] and

tingling into the right arm/leg." (*Id.* at 849.)  In addition, Plaintiff reported that his left shoulder

and left wrist hurt when he tried lifting, carrying, pushing, and pulling; and that, when he lay on

his left-side, his sleep was interrupted.  (*Id.*)  Plaintiff denied experiencing any adverse

side-effects from his prescribed medications.  (*Id.*)

First, upon reviewing Plaintiff's medical records, including the results from his earlier

MRIs, Dr. Schwartz noted, *inter alia*, that Plaintiff had a "C6-7 right paramedian dis[c]

herniation with extrusion and a radial annular tear [that was] impressing upon and flattening [the]

right ventral cord margin resulting in central spinal stenosis." (*Id.*)  Further, Dr. Schwartz

recorded that Plaintiff had posterior disc herniations at L3-4 and L4-5, along with a posterior disc

---

[31] While it is unclear whether Plaintiff testified incorrectly regarding the number of times
he was seen by Dr. Schwartz or if certain of this doctor's notes are missing from the Record, the
Court notes that Defendant has not taken issue with Plaintiff's characterization of Dr. Schwartz
as one of his "treating physicians."  Nor has Defendant suggested that Plaintiff's treatment
relationship with Dr. Schwartz was insufficient in scope or duration to qualify his medical
opinion for consideration under the so-called "treating physician rule." (*See* Discussion, *infra*, at
Sections I(D) and III(B)(1)(a).)

herniation at L5-S1 that was "nearly abutting [the] thecal sac and abut[ting] S1 nerve roots." (*Id.* (and recording that Plaintiff was suffering from posterior disc bulging at L2-3).)

Next, upon examination, Dr. Schwartz observed that Plaintiff demonstrated normal heel/toe walking and did not require an assistive device. (*Id.* at 850.) Dr. Schwartz also found, however, that Plaintiff suffered from reproduced pain on the right cervical and lumbosacral paraspinal trigger points and in his left shoulder. (*Id.*) As to Plaintiff's cervical range of motion, Dr. Schwartz wrote that Plaintiff demonstrated flexion of 30 degrees, extension of 20 degrees, left/right lateral bending of 20/30 degrees, and left/right rotation of 25/30 degrees. (*Id.*) For Plaintiff's lumbar range of motion, Dr. Schwartz wrote that Plaintiff exhibited flexion of 30 degrees, extension of 10 degrees, and left/right lateral bending of 10/10 degrees. (*Id.*) Dr. Schwartz also found that Plaintiff's muscle grade strength was 4+/5 in his cervical and lumbosacral paraspinals. (*Id.* (recording "Neer/Hawkins positive" for left shoulder impingement).) Further, as to the neurological portion of the examination, Dr. Schwartz recorded that Plaintiff's ability to sense "light touch" or "pinprick[s]" had "diminished" at "C5, C6, L4, [and] L5 dermatomes,"[32] and that Plaintiff's "[d]eep tendon reflexes" were at "2/4 throughout [his] bilateral upper extremities." (*Id.*)

---

[32] A dermatome is an area of the skin that "receives its nerve supply from a specific nerve root." Albert, Hanne B., *et al.*, *Where do patients with MRI-confirmed single-level radiculopathy experience pain, and what is the clinical interpretability of these pain patterns? A cross-sectional diagnostic accuracy study,* NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6778979/ (accessed Sept. 21, 2020).

Following the examination, Dr. Schwartz wrote a report wherein he diagnosed Plaintiff with (1) cervical derangement[33] with myofasciitis[34] and "probable underlying radiculopathy" plus multiple cervical disc herniations that were causing, *inter alia*, a "flattening [of the] right ventral cord margin resulting in central spinal stenosis";[35] (2) lumbosacral derangement with myofasciitis and "probable underlying radiculopathy" plus multiple lumbosacral disc herniations – where at least one of which was "nearly abutting [the] thecal sac and abut[ting] S1 nerve roots"; (3) left shoulder derangement with a probable rotator cuff tear and/or impingement; and (4) a left wrist derangement with a probable ligamental tear.  (*Id*. at 851.)  In the same report, Dr. Schwartz opined that Plaintiff was "total[ly] disabled from his previous level of work as a limo driver."  (*Id.*)  Dr. Schwartz instructed that Plaintiff should discontinue taking Mobic and Flexeril, and instead take Zorvolex.[36]  (*Id.*)  Dr. Schwartz also recommended that Plaintiff seek

---

[33] Derangement is "defined as an anatomical disturbance in the normal resting position of the joint."  *Rapid Resolution of Chronic Shoulder Pain Classified as Derangement Using the McKenzie Method: A Case Series*, NATIONAL CENTER FOR BIOTECHNOLOGY INFORMATION, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3822320/#:~:text=Derangement%20is%20an%20MDT%20classification,and%20rapidly%20reduce%20derangement%20symptoms. (accessed Sept. 11, 2020).

[34] Myofasciitis or myofascial pain syndrome "is a chronic pain disorder.  In this condition, pressure on sensitive points in your muscles (trigger points) causes pain in the muscle and sometimes in seemingly unrelated parts of your body.  This is called referred pain."  *Myofascial Pain Syndrome*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/symptoms-causes/syc-20375444 (accessed Sept. 21, 2020).

[35] "Spinal stenosis is a narrowing of the spaces within your spine, which can put pressure on the nerves that travel through the spine.  Spinal stenosis occurs most often in the lower back and the neck."  *Spinal Stenosis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961#:~:text=Spinal%20stenosis%20is%20a%20narrowing,lower%20back%20and%20the%20neck. (accessed Sept. 21, 2020).

[36] Zorvolex (Diclofenac) "is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild-to-moderate pain, and helps to relieve symptoms of arthritis (*eg*, osteoarthritis or

employment in a full-time, light-duty capacity, sedentary position,[37] and he marked Plaintiff as disabled for the purposes of Plaintiff's Workers' Compensation Claim.[38]  (*Id*.)

In that same report, Dr. Schwartz expressed a number of opinions regarding Plaintiff's functional limitations.  In this regard, he opined that Plaintiff should only "occasionally and not repetitive[ly]" lift and carry, or push or pull, 10 pounds; that he should sit or stand for only 15 to 20 minutes at a time, and take "frequent breaks from these positions as needed"; that he should walk only occasionally, and for only five to 10 minutes at a time; that he should climb stairs only occasionally and should avoid ladders, as well as "kneeling/bending/stooping/squatting positions"; and that he should avoid "exposure to extreme temperatures and high humidity and environmental hazards such as fumes and chemicals and operating heavy machinery."  (*Id*.)  Dr. Schwartz also opined that Plaintiff should only occasionally use mass transportation, and recommended that, for attending "medically necessary appointments and/or performing activities

---

rheumatoid arthritis), such as inflammation, swelling, stiffness, and joint pain."  *Diclofenac (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/diclofenac-oral-route/side-effects/drg-20069748?p=1 (accessed on Sept. 11, 2020).

[37] "Sedentary work is the least rigorous of the five categories of work recognized by SSA regulations.  These include 'very heavy,' 'heavy,' 'medium,' 'light,' and 'sedentary.'"  *Schaal v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).  "Sedentary work . . . generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day."  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *see also Carroll v. Secretary of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983) ("By its very nature 'sedentary' work requires a person to sit for long periods of time even though standing and walking are occasionally required.").  Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).

[38] "Findings of disability for workers' compensation purposes are of limited utility for disability purposes under the Social Security Act.  Those findings are geared to the person's prior employment and allow findings of partial disability.  The Social Security Act uses its own definition of disability."  *DeJesus v. Chater*, 899 F. Supp. 1171, 1177 (S.D.N.Y. 1995) (citing 42 U.S.C. § 423(d)(1); 20 C.F.R. § 404.1505).

such as grocery shopping," Plaintiff should have someone drive him in a car, "instead of driving" the car himself.  (*Id.*)  Finally, Dr. Schwartz opined that Plaintiff should "refrain from using the affected arm at/or below shoulder level[,] as well as reaching overhead in a repetitive manner," and that he should only "use the affected arm only occasionally, as needed."  (*Id.*)

Plaintiff saw Dr. Schwartz for at least a second time on December 3, 2016.  (*Id.* at 845.) At that time, it was recorded that Plaintiff was only taking "over-the-counter medications for pain management," because Zorvolex had reportedly caused "adverse [side] effects and dizziness."  (*Id.*)  Upon this follow-up examination, Dr. Schwartz wrote a second report wherein he reached all of the same medical conclusions as he had in October 2016, and he identified the same functional limitations.  (*Id.* at 847.)  Dr. Schwartz advised Plaintiff to visit again, if needed, and he referred Plaintiff to a pain management specialist (Dr. Dynof) for "re-evaluation post-injections when necessary."  (*Id.*)

### c.        Treatment by Dr. Harvey

Plaintiff first visited Dr. Harvey for chiropractic treatment on June 13, 2015.  (*Id.* at 919.) During this initial visit, Plaintiff complained of having headaches along with pain in his neck, lower back, left shoulder, left elbow, left wrist, right knee, and right leg.  (*Id.*)  Harvey noted there was inflammation and tenderness in Plaintiff's joints and that his "[m]otion palpation revealed restricted motor units in each area of his spine."  (*Id.*)  An orthopedic examination had also revealed derangement of both Plaintiff's cervical and lumbar spine.  (*Id.*)  Further, as to Plaintiff's cervical spine, Harvey recorded the following ranges of motion:  flexion – 40/60; extension – 35/50; left rotation – 45/80; right rotation – 55/80; left lateral rotation 25/40; and right lateral flexion 20/40.  (*Id.* at 921.)  As to Plaintiff's lumbar spine, the range-of-motion

results were: flexion – 50/90; extension – 20/30; left rotation – 15/30; right rotation –15/30; left lateral flexion – 10/20; and right lateral flexion – 15/20. (*Id.*)

Over the next year, up until September 29, 2016, Plaintiff visited Harvey on several occasions for treatment consisting of rehabilitation exercises, spinal adjustments, and physical therapy. (*Id.* at 738-795, 926-1064.)[39] At almost all of those visits, Harvey documented that Plaintiff had restricted range of motion and spasms in both his cervical and lumbar spines. (*See id.*) Harvey also occasionally documented that Plaintiff was experiencing numbness/tingling in his lower back. (*See id.* at 934-35, 962.)

Plaintiff's final visit with Harvey was on May 19, 2017. (*Id.* at 919-22.) At that visit, Harvey noted that Plaintiff complained of "sharp and throbbing" neck pain, constant paraspinal spasms, left arm pain, and "sharp left shoulder pain." (*Id.* at 919.) Plaintiff also reported experiencing headaches that were "intermittent in nature," "sharp and stabbing" lower back pain, a "constant numbness and weakness into [his] right leg," and "sharp knee pain." (*Id.* (also recording that "[w]alking increase[d] [Plaintiff's] knee pain," flexion of [his] knee had decreased, and certain activities, including bending, lifting, sitting or standing for periods of time, increased [his] pain and led to spasms").) Although Harvey noted that Plaintiff's cervical and lumbar ranges of motion had increased over the past two years of treatment (*id.* at 922), he also wrote that it was "clear that [Plaintiff] continue[d] to suffer from significant levels of loss of range of motion in all levels of his cervical and lumbar spine 23 months after the accident" and that, in his opinion, these range-of-motion findings were "significant and permanent in nature" (*id.*).

---

[39] The Record does not include any treatment notes from Harvey between October 2016 and April 2017.

Harvey diagnosed Plaintiff with various cervical and lumbar spinal conditions including, *inter alia*, cervical and lumbar disc herniations, cervical and lumbar strains/sprains, and strains/sprains of his left shoulder and right knee.  (*Id.* at 924.)  Harvey opined that Plaintiff suffered from a "moderate permanent partial disability."  (*Id*. at 925; *see id.* at 924 ("Due to the nature of [Plaintiff's] injuries[,] he has difficulty doing his activities of daily living without sharp pain and spasm.").)  Harvey concluded that there was a causal connection between the accident and Plaintiff's injuries (*id.*), and he recommended that Plaintiff refrain from lifting over 20 pounds, lifting over his shoulder, repetitive bending, and sitting or standing for more than 20 minutes at a time.  (*Id*. at 923-24; *see id.* at 925 (noting Plaintiff's "significant limitations in the use and function of his neck and lower back").)

### 3.    Consultant Examiners for Plaintiff's Workers' Compensation Claim

As Plaintiff claimed to have been injured during the course of his job as a limousine driver, he filed a Workers' Compensation claim.  (*See id.* at 116-17.)  In August 2016, Plaintiff was examined in connection with that claim by two medical doctors – a family medicine practitioner, Dr. Julia Kaci (*id*. at 731-37), and an orthopedic surgeon, Dr. James Depuy (*id*. at 1065-73).[40]

#### a.    Examination by Dr. Kaci

Plaintiff was seen on August 2, 2016 by Dr. Kaci, to whom he had been referred by the New York State Division of Disability Determination ("DDD") for an internal medicine examination.  (*See id*. at 731-37.)  Dr. Kaci noted that Plaintiff "complain[ed] of intermittent pain in the lower back, which [was] brought on by lying down, walking more than 45 minutes to

---

[40] Ultimately, as was explained during the Hearing, Plaintiff was denied Workers' Compensation benefits because it was determined that he was not "an employee."  (R. at 42.)

an hour, [and] sitting more than one to two hours." (*Id*. at 731.) On the 10-point pain scale, Plaintiff rated his lower back pain was at 8-9/10 at night and 4-5/10 during the day. (*Id*.) He also reported that he experienced intermittent neck pain, which was "brought on by sleeping, driving, and neck movements" and that his neck pain level was at 5-6/10 during the day and 7/10 at night. (*Id*. (also recording that Plaintiff's neck pain "radiate[d] down [his] shoulder" and that, at times, he felt "numbness on [his] right elbow").)

As to his daily activities, Plaintiff reported that "he [did] not do any activities of daily living, except for showering, bathing, and dressing," but he went on to state that he did "go[] out to eat and socialize with friends." (*Id*. at 731-32.) Dr. Kaci noted that, while Plaintiff did not appear to be in acute distress, he could not walk on his toes due to his lower back pain and walked on his heels "with difficulty." (*Id*. at 732.) She also recorded that Plaintiff did not need assistance changing for the exam or getting on and off the exam table, and that he rose from the chair without difficulty. (*Id*.)

During a musculoskeletal evaluation, Dr. Kaci found that Plaintiff's cervical spine exhibited flexion of 40 degrees and extension of 10 degrees, and that there was full lateral flexion bilaterally and full rotary movement bilaterally. (*Id*. at 733.) Dr. Kaci also wrote that Plaintiff's lumbar spine demonstrated flexion of 80 degrees and extension of 10 degrees with full lateral flexion bilaterally and full rotary movement bilaterally. (*Id*.) Dr. Kaci further found that Plaintiff exhibited full range of motion bilaterally in his shoulders, elbows, forearms, wrists, hips, and ankles. (*Id*.) Dr. Kaci also wrote that there was "[n]o sensory deficit noted" and that Plaintiff's muscle strength was "4+ out of 5 in [his] upper and lower extremities." (*Id.*)

Upon evaluation, Dr. Kaci diagnosed Plaintiff with chronic neck pain and chronic lower back pain, with radiculopathy. (*Id*. at 734.) According to Dr. Kaci, Plaintiff's prognosis was

24

stable, and Plaintiff had "mild limitations" as to sitting, along with "moderate limitations" as to standing, walking, lifting, carrying, pushing, and pulling.  (*Id*.)

### b.    Examination by Dr. Depuy

Dr. Depuy examined Plaintiff on August 24, 2016, also in connection with his Workers' Compensation Claim.  (*Id*. at 1065-73.)  Along with conducting an independent medical evaluation, Dr. Depuy reviewed the notes from Plaintiff's visits with Dr. Dynof and his MRI results.  (*Id*. at 1069-70.)  Dr. Depuy noted that Plaintiff's chief complaints of pain were in his neck and back, although he also reported pain in his left shoulder and left wrist.  (*Id*. at 1068.)  Dr. Depuy recorded that, as to his cervical spine, Plaintiff demonstrated 30 degrees of side turn, 30 degrees of lateral bend, 60 degrees of flexion, and 60 degrees of extension.  (*Id*. at 1070 (noting negative Hawkin's test).)  In addition, Dr. Depuy recorded that, for Plaintiff's lumbar spine, he exhibited 60 degrees of forward flexion, 20 degrees of extension, and 30 degrees of side turn and lateral bend.  (*Id*. (also recording that, while Plaintiff's "[n]eurological [condition was] intact to motor, sensory and reflexes," the straight leg test was "positive for back pain").)

Dr. Depuy diagnosed Plaintiff with:  left wrist pain, left shoulder traumatic impingement, cervical strain, and "multiple herniated disc and lumbosacral strain and herniated disc multiple with facet mediated also in the lower three lumbar levels."  (*Id*. at 1070-71.)  Dr. Depuy opined that Plaintiff's injuries had a causal relationship with his car accident and that Plaintiff was "50% (moderately) disabled."  (*Id*. at 1071.)

### C.    Plaintiff's Testimony Before the ALJ

On May 15, 2018, Plaintiff, represented by his attorney, testified at the Hearing before the ALJ.  (*Id*. at 36-61.)  When asked to describe what happened "after the [car] accident" on June 2, 2015, Plaintiff recalled that, as he was taken to the hospital in an ambulance, he was

experiencing "really bad back pain, . . . neck pain, and shoulder pain," along with bruising from his left shoulder down to his chest.  (*Id.* at 46.)[41]  After he was seen by doctors and prescribed medications, Plaintiff was discharged and went home to sleep "through the entire night"; but, Plaintiff testified that, when he woke up the next morning, he was in a "massive amount of pain, especially in [his] back."  (*Id.* at 47.)  Plaintiff stated that, soon after, he started to make regular visits to Dr. Dynof, whom he described as his "pain management doctor" (*id.*), in addition to attending physical therapy and acupuncture appointments (*id.*).  Plaintiff also testified that, because he was "still in pain" after those appointments, he began receiving injections.  (*Id.*)  According to Plaintiff, the relief he felt from those injections was "hit or miss."  (*Id.* at 48.)  He explained that, while he would typically experience relief for 24 to 48 hours, the pain would come back, and he also testified that he experienced "side effects" from the injections, as they made his entire body feel cold, his joints tingle, and his feet feel a "burning" sensation.  (*Id.*).

Plaintiff testified that he also visited Dr. Harvey and Dr. Schwartz.  (*Id.* at 48-49.)  When asked about his reason for visiting Dr. Schwartz, Plaintiff began to say that he believed Dr. Schwartz was "the worker[s'] comp. doctor," but his attorney interjected to explain that Dr. Schwartz was "not the independent medical examiner," but rather was Plaintiff's "treating doctor."  (*Id.* at 49.)  When the ALJ asked Plaintiff how many times he saw Dr. Schwartz, Plaintiff – as noted above – testified that he thought he saw him for "six to eight visits."  (*Id.*)

---

[41] Although not addressed during the Hearing, Dr. Schwartz's notes provide additional information about the accident, as apparently described by Plaintiff during one of his visits.  (*See* R. at 849.)  Based on those notes, Plaintiff reported that, at the time of the accident, he had been "stopped at a yield sign while driving the [limousine] vehicle and [was] wearing a seatbelt[,] when his vehicle was suddenly and violently rear-ended by another vehicle."  (*Id.*)  According to Plaintiff, his "body was violently jolted forward and backward into the seat[,] [h]is left shoulder struck the door and window, and [his] left wrist was twisted while holding the steering wheel." (*Id.*)

The ALJ commented, however, that there was only documentation for "a couple of visits" in the Record.  (*Id*.)

Plaintiff also gave testimony at the Hearing in response to questioning from his counsel. (*See id*. at 51-55.)[42]  When asked if he had ever used any assistive devices for walking, Plaintiff testified that he used a cane for six to eight months after the accident.  (*Id*.)  Plaintiff also explained that he could sit for no more than about 35 to 45 minutes at a time and he could walk for no longer than hour without experiencing pain.  (*Id*. at 51-52.)  As to the injections he had received, Plaintiff testified that, upon receiving an injection, he would feel a tingling sensation that would last for a couple of hours up to a full day and that he eventually would need to apply ice to his feet to combat the burning sensation.  (*Id*. at 52.)  As for over-the-counter medications, Plaintiff stated that he took Tylenol, Advil, Midol, and NyQuil to sleep.  (*Id*. at 53.)  He also testified that he used an electrical heating and cooling pad (which had a massage mechanism for his neck), which Dr. Harvey had given him.  (*Id*.)

When asked about the frequency with which he used the heating/cooling pad, Plaintiff responded that he used it every time he sat down.  (*Id*.)  He also testified that he was only able to drive for an hour before his back pain would cause him to feel dizzy.  (*Id*. at 54 (also stating that, after driving for an hour, his "eyes [would] start to get blurry, [and he would] start sweating, and [he would] just lose focus").)  When asked why he stopped using a cane, Plaintiff explained that it was "just causing more pain" in his left shoulder "than it was doing any[thing to] help."  (*Id.*) As to his sleep, Plaintiff testified that, on average, he slept for four hours per night, but there were occasions when he would wake up and move around or take medications, such as NyQuil,

---

[42] Although, at page 51 of the Record, the Hearing transcript refers to the "Examination of [the] Vocational Expert by the [ALJ]," that appears to be a typographical error, as the substance of the transcript at that point seems to reflect questioning of Plaintiff by his attorney.

Tylenol, or Midol to aid him in falling back asleep.  (*Id.* at 54-55.)  Finally, when asked why he stopped receiving treatment for his injuries, Plaintiff testified that it was because he lacked health insurance, and that, if possible, he would have continued treatment, specifically so that he could have surgery for his left shoulder and an epidural for his back.  (*Id.* at 55.)

> D.   **The VE's Testimony Before the ALJ**

At the Hearing, the VE testified regarding the exertional requirements of Plaintiff's past work.  (*See id.* at 56-58.)  She explained that Plaintiff's prior work as a security guard/shuttle driver equated to his having been a "van driver," which she categorized as a semi-skilled position with a medium physical demand; she further testified that Plaintiff's prior work as a concession worker equated to his having been a "vendor," which would have also required a medium physical demand; and she testified that his prior work as a warehouse worker equated to his having been a "laborer," which again would have required a medium physical demand.  (*See id.* at 57.)  The VE did not attempt to classify Plaintiff's job as a limousine truck driver, as, according to her, that position "didn't meet SGA levels."  (*Id.*)

The ALJ then asked the VE to consider whether Plaintiff's past work could be performed by a hypothetical person of Plaintiff's age, education, and work history, with the RFC to engage in a full range of sedentary exertional work as defined in the Dictionary of Occupational Titles ("DOT"), but with the following limitations:  the person could occasionally stoop, crouch, kneel, climb, and descend stairs, push and pull, and reach overhead with the non-dominant left upper extremity.  (*Id.* at 58.)  Further, while the person would have the ability to flex, extend, and rotate the neck, he could not climb ladders, ropes, scaffolds, or work at temperature extremes, and would need to "be able to alternate between sitting and standing at will while still on task."  (*Id.*)

Considering these limitations, the VE testified that such a hypothetical person could not perform any of Plaintiff's past work.  (*Id.*)  The VE, however, went on to testify that such a hypothetical person could perform certain sedentary, unskilled jobs existing in the national economy, including the job of a table worker (also known as a spotter), compact assembler, touch-up screener (also known as a circuit board assembler), and lens inserter.  (*Id.* at 58-59.)

In response to further questioning from Plaintiff's counsel, though, the VE also stated that these representative jobs could not be performed by an individual if he were off-task for 20 percent or more of the day, or if he were absent from work more than "one day per month." (*Id.* at 59.)

### E.      The Current Action and the Motions Before the Court

Represented by counsel, Plaintiff filed the Complaint in this action on March 25, 2019, challenging the decision of the Commissioner denying him SSDI benefits under Title II of the Act.  (*See* Complaint, dated March 25, 2019 ("Compl.") (Dkt. 1).)  Plaintiff maintained in his Complaint that he was entitled to SSDI benefits.  (*Id.* ¶ 6.)

On August 19, 2019, Plaintiff filed a motion for judgment in his favor, seeking reversal of the Commissioner's decision, and either an award of benefits or remand for further proceedings.  (Dkt. 11.)  In his motion and accompanying brief, Plaintiff purported to rely on Rule 56, which governs motions for summary judgment, although he confusingly referred to his motion as one "for summary judgment on the pleadings."  (*Id.*; *see also* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment on the Pleadings, dated Aug. 19, 2019 ("Pl. Mem.") (Dkt. 12).)  In substance, it appears that Plaintiff has intended to seek judgment in his favor on the pleadings, and, as Rule 56 is generally not considered the proper procedural vehicle for challenging a disability determination of the Commissioner, *see Mersel v. Heckler*, 577 F.

29

Supp. 1400, 1401 n.1 (S.D.N.Y. 1984), the Court will treat Plaintiff's motion as if made under Rule 12(c).

On October 16, 2019, Defendant opposed Plaintiff's motion and filed a cross-motion for judgment on the pleadings in favor of the Commissioner (Dkt. 15), supported by a memorandum of law (Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings, dated Oct. 16, 2019 ("Def. Mem.") (Dkt. 16)).  Rather than filing a reply brief, on November 5, 2019, Plaintiff's counsel submitted a one-page letter to the Court, stating that Plaintiff rested on his original motion papers in support of his application for SSDI benefits.  (Letter to the Court from Joseph A. Romano, Esq., dated Nov. 5, 2019 (Dkt. 17).)

**DISCUSSION**

**I.     APPLICABLE LEGAL STANDARDS**

    **A.     Judgment on the Pleadings**

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied, and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition

of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, the Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

### B.    The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. § 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  Throughout the inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* §§ 404.1520(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an

impairment listed 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (the "Listings"). *Id.*
§ 404.1520(a)(4)(iii). If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id.* § 404.1520(d).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the Record, the claimant's RFC, or ability to perform physical and mental work activities on a sustained basis. *Id.* § 404.1545. The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.* § 404.1520(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim. *See Berry*, 675 F.2d at 467 (internal citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors. 20 C.F.R. § 404.1560(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App'x 2 (the "Guidelines"). Where, however, the claimant suffers non-exertional impairments, such as visual impairment, psychiatric impairment, or pain, that

33

"'significantly limit the range of work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published guidelines. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (internal citations omitted)).

### C.     Duty To Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *accord Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 262 (S.D.N.Y. 2016) (noting that "[r]emand is appropriate where this duty is not discharged"). Indeed, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'" *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).

The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports. . . . 'Every reasonable effort' means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow[-]up request to obtain the medical evidence necessary to make a determination.

20 C.F.R. §§ 404.1512(b)(1), (b)(1)(i). "[I]f the documents received lack any necessary information, the ALJ should recontact the treating physician." *Oliveras ex rel. Gonzalez v. Astrue*, No. 07cv2841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report*

*and recommendation adopted*, 2008 WL 2540816 (June 25, 2008).  The ALJ also has the authority to subpoena medical evidence on behalf of the claimant, 42 U.S.C. § 405(d), but is not required to subpoena medical records if they are not received following two ordinary requests, *Gonell De Abreu v. Colvin*, No. 16cv4892 (BMC), 2017 WL 1843103, at *5 (E.D.N.Y. May 2, 2017); 20 C.F.R. § 404.950(d)(1).

The SSA regulations further explain that a claimant's "complete medical history" means the records of his or her "medical source(s)."  20 C.F.R. § 404.1512(b)(1)(ii).  If the information obtained from medical sources is insufficient to make a disability determination, or if the ALJ is unable to seek clarification from treating sources, the regulations also provide that the ALJ should ask the claimant to attend one or more consultative evaluations.  *Id.* §§ 404.1512(b)(2), 404.1517.  Where, however, there are no "obvious gaps" in the record and where the ALJ already "possesses a 'complete medical history,'" the ALJ is "under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa*, 168 F.3d at 79 n.5.

The question of "[w]hether the ALJ has met his duty to develop the record is a threshold question.  Before reviewing whether the Commissioner's final decision is supported by substantial evidence . . . the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record."  *Craig*, 218 F. Supp. 3d at 261-62 (internal quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  Further, the court must satisfy itself that the administrative record has been adequately developed, regardless of whether the issue is raised by the plaintiff.  *See Castillo v. Comm'r of Soc. Sec.*, No. 17cv09953 (JGK) (KHP), 2019 WL 642765, at *7 (S.D.N.Y. Feb. 15, 2019) (noting that, even where the plaintiff does not argue that

an ALJ failed to develop the record, the court "is nevertheless obliged to conduct its own independent assessment of whether the ALJ properly discharged this duty").

### D.    The Treating Physician Rule

Under the so-called "treating physician rule,"[43] the medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).  "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  *Id.* § 404.1502.  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  *Id.* § 404.1527(c)(2); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004) (Summary Order).

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion. 20 C.F.R. § 404.1527(c)(2).  Failure to "give good reasons" is grounds for remand.  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's

---

[43] In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be in effect for applications made to the SSA on or after March 27, 2017.

opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating

physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS),

2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing, *inter alia*, 20 C.F.R.

§ 404.1527(d)(2)[44]), including:  (1) the length of the treatment relationship and the frequency of

examination; (2) the nature and extent of the treatment relationship, including whether the

treatment received was particular to the claimant's impairment; (3) the supportability of the

physician's opinion; (4) the consistency of the physician's opinion with the record as a whole;

and (5) the specialization of the physician providing the opinion, 20 C.F.R. §§ 404.1527(c)(2)-

(5);  *see Shaw*, 221 F.3d at 134 (noting that these five factors "must be considered when the

treating  physician's opinion is not given controlling weight").

        Even where a treating physician's opinion is not entitled to "controlling weight," it is

generally entitled to "more weight" than the opinions of non-treating and non-examining

sources.  20 C.F.R. § 404.1527(c)(2); *see* SSR 96-2p (S.S.A. July 2, 1996) ("In many cases, a

treating source's medical opinion will be entitled to the greatest weight and should be adopted,

even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F.

Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is

generally  entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009)

(Summary Order) (internal quotation marks and citation omitted).  This is because consultative

examinations "are often brief, are generally performed without benefit or review of the

claimant's medical history, and, at best, only give a glimpse of the claimant on a single day."

---

        [44] On February 23, 2012, the Commissioner amended 20 C.F.R. § 404.1527, by, among
other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs
(c) through (e).

*Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citations omitted). The opinions of consultative physicians, though, "can constitute substantial evidence in support of the ALJ's decision" when the opinion of a claimant's treating physician cannot be obtained. *Sanchez v. Commissioner of Social Sec.*, No. 15cv4914, 2016 WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted*, 2017 WL 979056 (Mar. 13, 2017).

## II.   <u>THE ALJ'S DECISION</u>

On August 2, 2018, ALJ Gonzales issued his decision, finding that Plaintiff was not disabled under the Act and thus did not qualify for SSDI benefits. (R. at 10-21.) In rendering his decision, the ALJ applied the five-step sequential evaluation.

### A.   <u>Steps One Through Three of the Sequential Evaluation</u>

At Step One, the ALJ determined that Plaintiff had met the insured-status requirements of the Act through December 31, 2020, and that he had not engaged in substantial gainful activity during the requested closed period of June 6, 2015 to May 31, 2017. (*Id.* at 12.)

At Step Two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical, lumbar, and thoracic spine; left shoulder impingement; left lateral epicondylitis; and post-traumatic headache disorder. (*Id.*)

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the impairments included in the Listings at Sections 1.02 ("Major dysfunction of a joint(s) (due to any cause)"), or 1.04 ("Disorders of the spine"). (*Id.* at 13.) As to Listing 1.02, the ALJ explained that Plaintiff did not demonstrate:

> [a] gross anatomical deformity and chronic joint pain and stiffness
> with signs of limitation of motion or other abnormal motion of the

38

> affected joint(s), and findings on imaging studies of joint
> narrowing, bony destruction, or ankylosis of the affected joint(s).
> With:  involvement of one major peripheral weight-bearing joint
> (i.e., hip, knee, or ankle), resulting in inability to ambulate
> effectively.

(*Id.*)[45]  In addition, with respect to Listing 1.04, the ALJ noted that the Record failed to

demonstrate compromise of a nerve root or the spinal cord with additional findings of:

(A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain,

limitation or motion of the spine, motor loss accompanied by sensory or reflex loss and, if there

is involvement of the lower back, positive straight-leg raising; or (B) spinal arachnoiditis; or

(C) lumbar spinal stenosis resulting in pseudoclaudication.  (*Id.*)

### B.    The ALJ's Assessment of Plaintiff's RFC

The ALJ then found that Plaintiff had the RFC to:

> perform sedentary work as defined in 20 C.F.R. § 404.1567(a)
> except [as] limited to occasional stooping, crouching, kneeling,
> climbing and descending stairs, and pushing and pulling; limited to
> occasional reaching overhead with the left upper extremity,
> frequently flex[,] extend[,] and rotate the neck; no climbing
> ladders[,] ropes[,] and scaffolds; no working with extreme
> temperatures; and can alternate between sitting and standing at
> will, while still on task.

(*Id.*)  In making this RFC determination, the ALJ found that, Plaintiff had "medically

determinable impairments [that] could reasonably be expected to cause the alleged symptoms"

that he had described, but that his "statements concerning the intensity, persistence, and limiting

---

[45] Listing 1.00B2b defines "an inability to ambulate effectively" as an "extreme limitation of the ability to walk," *i.e.,* an impairment that "interferes very seriously with a claimant's ability to independently initiate, sustain, or complete activities."  Ineffective ambulation generally means that one has insufficient leg function to allow independent walking without the use of hand-held assistive devices that limit the functioning of both upper extremities.  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00B2b (examples of ineffective ambulation include "the inability to walk without the use of a walker, two crutches[,] or two canes").

effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the [R]ecord," and, ultimately, with the RFC assessment the ALJ had developed based on that evidence.  (*Id.* at 19.)

In evaluating the extent of Plaintiff's physical impairments, the ALJ first considered the various medical tests and scans that Plaintiff underwent during the requested closed period.  (*See id*. at 14-15.)  The ALJ noted that the nerve conduction test revealed "radiculopathy," and the MRIs from July 2015 demonstrated that Plaintiff had several herniated discs, annual disc tears, and disc bulging.  (*See id*.)  In addition, the ALJ noted that the MRI of Plaintiff's left shoulder in December 2015 "indicated [a] questionable partial tear" of his tendon.  (*Id*. at 15.)  The ALJ then summarized Plaintiff's treatment records from 2015 to 2017, and he went on to weigh the opinions of Plaintiff's treating providers (Dr. Dynof, Dr. Schwartz, and Dr. Harvey) and the consultant examiners (Dr. Kaci and Dr. Depuy).  (*See id*. at 15-18.)

Starting with Dr. Dynof, the ALJ observed that, despite positive findings in Plaintiff's lumbar, cervical, and thoracic spine, along with left shoulder impingement, Dr. Dynof's treatment notes reflected that Plaintiff "consistently only showed slight reductions in range of motion testing."  (*Id.* at 15.)  Moreover, referring to Dr. Dynof's examination findings, the ALJ stated that Plaintiff had demonstrated a lack of distress and had shown "5/5 muscle strength 'in all muscle groups.'"  (*Id.*)  The ALJ also noted that Plaintiff's treatment with Dr. Dynof had remained conservative throughout the relevant period, and that Dr. Dynof had continued to encourage Plaintiff to participate in a home exercise program.  (*Id.*)  The ALJ recited Dr. Dynof's opinion that Plaintiff suffered from a "permanent loss of overall motion in his cervical and lumbar spine and in left shoulder and right knee" and that Plaintiff's condition was "permanent and [it was] likely that exacerbation [would] occur in the future."  (*Id.*)  The ALJ,

however, chose to assign that opinion "little evidentiary weight," on the grounds that "it [was] a vague assessment and [was] not a specific function-by-function assessment." (*Id.*) The ALJ did not provide any further basis for discounting Dr. Dynof's opinion, even though he was one of Plaintiff's treating physicians. (*See id.*)

Turning to Dr. Schwartz, the ALJ reviewed the doctor's notes from both his October and December 2016 sessions with Plaintiff. The ALJ noted that, at the October visit, Plaintiff had presented to Dr. Schwartz with complaints of persistent pain in the neck and lower back, along with episodes of referred pain, numbness, and tingling; occasional stiffness and tightness in the arm and leg; and pain in the left shoulder and left wrist when performing certain activities. (*Id.* at 16.) The ALJ also pointed out that, during that same visit, Plaintiff had reported taking Mobic for pain management without adverse effects, while being independent with respect to dressing/undressing, feeding, grooming, and personal hygiene. (*Id.* at 17.) The ALJ further observed that Dr. Schwartz had suggested a home exercise program for treatment; had recommended that Plaintiff "seek employment in a full-time, light-duty capacity, sedentary in nature;" and had opined that Plaintiff was "disabled from his previous level of work as a limo driver." (*Id.*) After summarizing Dr. Schwartz's opinions regarding Plaintiff's functional limitations and his recommendations for Plaintiff's work conditions, the ALJ assigned "great evidentiary weight" to Dr. Schwartz's opinion that Plaintiff could not return to his past work, and "some evidentiary weight" to his opinion that Plaintiff should be limited to lifting up to 10 pounds, finding that the "generally stable examination findings" in the Record supported that conclusion. (*Id.*) On the other hand, the ALJ stated that, "as to the remaining functional limitations, Dr. Schwartz[ . . . did] not provide a well-reasoned analysis or articulate the reasons for such limitations" and that "those limits [were] not supported or consistent with the [R]ecord

41

as a whole." (*Id.* at 18.)[46] Thus, the ALJ apparently assigned no weight to Dr. Schwartz's

opinion regarding those additional functional limitations.

As to the chiropractor, Dr. Harvey, the ALJ first noted that Dr. Harvey's sessions with

Plaintiff consisted of spinal manipulations and manual therapy. (*Id.* at 18.) Then, the ALJ

pointed to Dr. Harvey's statement on June 8, 2017 that Plaintiff continued to suffer from "spinal

fixations, subluxations, disc bulges, disc herniations and biomechanical abnormalities causing

sharp pain and spasms"; that Plaintiff's injuries were "clearly the result of the accident that

occurred on 6/2/2015"; that Plaintiff had responded slowly to care; and that Plaintiff suffered

from a moderate permanent disability. (*Id.*) As to Dr. Harvey's opinion, the ALJ wrote that,

although Harvey was not a recognized source, "some evidentiary weight [was to be] accorded to

[his] opinion since the lifting, carrying, standing[,] and walking limits [that Dr. Harvey

identified] [were] well supported by the generally stable examination findings throughout the

[R]ecord." (*Id.*) Yet, at the same time, the ALJ found that Dr. Harvey's opinion as to Plaintiff's

"limitations in sitting" was "poorly supported by the treatment records and [Plaintiff's] daily

activities, which include[d] watching television, reading[,] and driving." (*Id.*) Further, the ALJ

---

[46] In the decision, the ALJ also said that he was assigning "little evidentiary weight" to Dr. Schwartz's supposed opinion "that Plaintiff could not return to work in any capacity" on the grounds that it was "poorly supported by the clinical findings, which generally showed almost full muscle strength, minimal neurological involvement and only conservative treatment." (R. at 18.) This appears to have been a mischaracterization of Dr. Schwartz's notes and opinion. Looking to Dr. Schwartz's notes from the initial evaluation on October 1, 2016, in the section labeled "Work history," he wrote that *Plaintiff* "[s]tated he ha[d] been unable to return to work as a limo driver or in any other work capacity since the accident date." (*Id.* at 849; *see also id.* at 845.) Dr. Schwartz then described Plaintiff's prior "work duties" as a limousine driver. (*Id.*) Notably, this section of the notes was focused on Plaintiff's reports of his past work experience; it was *not* the section where, after a full evaluation, Dr. Schwartz issued his diagnoses and opinions about Plaintiff's functional work limitations. (*Compare id.* at 851, *and id.* at 847.) Thus, the ALJ appears to have erred by mischaracterizing Plaintiff's reported statement about his inability to return to work as Dr. Schwartz's own opinion.

found that Dr. Harvey's use of the term "moderate permanent disability" was "vague" and had been used in the context of Plaintiff's Workers' Compensation claim, which was not "relevant or probative with regard to [Plaintiff's] application under the Social Security Act."  (*Id.*)

Turning to the notes from consultative examiner Dr. Kaci, the ALJ pointed to the August 2, 2016 consultation in which Plaintiff had reported that he enjoyed watching television, listening to the radio, reading, and going out to socialize with friends.  (*Id.* at 15.)  The ALJ also noted that Dr. Kaci had reported that Plaintiff did not appear to be in any acute distress, even though he had complained of back pain, could not walk on his toes, and had walked on his heels with difficulty.  (*Id.*)  After summarizing Dr. Kaci's findings from her musculoskeletal examination, and noting that Dr. Kaci had assessed Plaintiff as suffering from chronic neck pain and chronic lower back pain, with radiculopathy, the ALJ pointed out that Dr. Kaci had also opined that Plaintiff had only mild limitations in sitting, along with moderate limitations to standing, walking, lifting, carrying, pushing, and pulling.  (*Id.* at 16.)  The ALJ then stated that he was according "[s]ome evidentiary weight" to Dr. Kaci's opinion "since [Dr. Kaci was] an expert for the agency and the opinion [was] well supported by her own clinical findings, which were mostly benign."  (*Id.*)

Lastly, for the consultative examiner Dr. Depuy, the ALJ looked to Plaintiff's visit on August 24, 2016 and summarized the results from the various tests conducted on that date.  (*Id.*)  The ALJ then acknowledged that Dr. Depuy had ultimately opined that Plaintiff was "50% (moderately) disabled," and, specifically, that he suffered from "wrist pain, left shoulder traumatic impingement, cervical sprain, and multiple herniated disc and lumbosacral strain and herniated disc multiple with facet mediated in the three lumbar levels."  (*Id.*)  Considering this opinion, the ALJ wrote that he was according it "[s]ome evidentiary weight" because Dr. DePuy

was "an expert in his field and an examining source." (*Id.*)  While acknowledging that

Dr. DePuy "[did] not provide an exact functional assessment," the ALJ nonetheless stated that

Dr. DePuy's "assessment [did] assume that [Plaintiff] [could] return to less demanding work."

(*Id.*)

      After weighing the medical opinion evidence, the ALJ summarized Plaintiff's reported

statements, in his submitted Function Report, that he cooked, drove, shopped in stores, spent

time with friends watching television, and went to restaurants and the movie theatre.  (*Id.*)  The

ALJ also took note of Plaintiff's reports that he was able to kneel, squat, and reach, and that he

did not have any issues with his hands.  (*Id.*)  While recognizing that Plaintiff had reported that

he could not lift heavy items and could only stand and walk for minimal periods of time, the ALJ

went on to conclude that Plaintiff's self-reported activities supported the determination that he

had the ability to perform sedentary work.  (*Id.*)  The ALJ then evaluated Plaintiff's symptoms,

including his reported pain levels, using the factors described in 20 C.F.R. § 404.1529(c)(3) and

SSR 16-3p.  (*Id.* at 19.)  Based upon that evaluation, the ALJ found that Plaintiff's subjective

complaints of his impairments were inconsistent with the medical evidence.  (*See id.*)  The ALJ

concluded that the RFC described above was appropriate and supported by objective medical

evidence.  (*Id.*)

### C.      <u>Steps Four and Five of the Sequential Evaluation</u>

      At Step Four, based on his finding that Plaintiff had the RFC to perform sedentary work

with the aforementioned limitations, and the VE's testimony, the ALJ found that Plaintiff was

unable to perform his past relevant work as a van driver, concessions vendor, and laborer, which

were all classified as work with medium physical demands.  (*Id.* at 20.)

At Step Five, however, the ALJ found that Plaintiff was able to perform work existing in the national economy during the relevant period. (*Id.*) In making this determination, the ALJ considered Plaintiff's age,[47] education, work experience, and RFC. (*Id.* at 21.) The ALJ also relied on the testimony of the VE, who testified that an individual of Plaintiff's age, education, work experience, and RFC (as determined by the ALJ) would be able to perform various sedentary, unskilled jobs existing in the national economy. (*Id.*) The ALJ therefore concluded that Plaintiff had not been "disabled," as defined under the Act, from June 6, 2015 (the date of the alleged onset) through May 31, 2017 (the last day of the closed period). (*Id.*)

## III.   REVIEW OF THE ALJ'S DECISION

As the ALJ used the applicable five-step evaluation in analyzing Plaintiff's claims, the initial question before the Court is whether, in evaluating Plaintiff's claims under this accepted protocol, the ALJ made any errors of law that might have affected the disposition of the claim. If the ALJ did not commit legal error, then the Court must go on to determine whether the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence.

In his memorandum, Plaintiff argues that the ALJ committed two legal errors: first, by failing to make a proper evaluation as to whether Plaintiff's severe impairments met or equaled a listing under 20 C.F.R. § 404, Subpart P, Appendix 1 (Pl. Mem., at 10-11); and, second, by affording little weight to Dr. Schwartz's medical opinion concerning Plaintiff's functional limitations, including that Plaintiff should refrain from using his left arm at/or below shoulder level, as well as to reach overhead in a repetitive manner, and that he should use that arm only

---

[47] As set out above, Plaintiff was 27 years old at the alleged disability onset date, making him a "younger person" under 20 C.F.R. § 404.1563(c), which defines such a person as being under 50 years of age. (*Id.*) Under that regulation, the Commissioner considers that the ability of those who are younger than 50 years to adjust to other work is not seriously limited. (*Id.*)

occasionally (*id.* at 11; *see also* R. at 187).  In response, Defendant argues (1) that substantial

evidence supported the ALJ's finding that Plaintiff did not meet a Listing and (2) that

Dr. Schwartz's opinion was not entitled to controlling weight because his "claims of vague,

unspecified manipulative limitations" were "belied" by the consultative examiner Dr. Kaci's

findings.  (Def. Mem., at 17-18, 25.)  As to this latter point, Defendant also contends that the

ALJ provided "good reasons" in discounting Dr. Schwartz's opinion and that, overall, the ALJ

made a decision that was in accordance with the treating physician rule.  (*See id.* at 25.)

  Upon review of the Record, the Court agrees with Plaintiff that the ALJ *did* make errors

of law that might have affected the outcome of Plaintiff's claims.

  First, the Court is unable to conclude that the ALJ's decision that Plaintiff failed to satisfy

a Listing under 20 C.F.R. § 404, Subpart P, Appendix 1 is supported by substantial evidence,

where the ALJ failed to set out his reasoning and, in particular, failed to address conflicting

medical evidence in the Record, much of which could have supported a finding that Listing

1.04(A) (Disorders of the Spine) was met for the covered period.  And, second, even if Plaintiff's

impairments did not meet or equal that Listing, the Court finds that the ALJ failed to take

adequate steps to develop the Record with respect to Dr. Schwartz's (and, relatedly, Dr. Dynof's)

medical opinions of Plaintiff's functional limitations.  Rather than seek clarification from

Dr. Schwartz as to his opinions regarding Plaintiff's left arm and shoulder limitations and

Plaintiff's need for frequent breaks, the ALJ merely rejected the majority of these functional

limitations on the bases that Dr. Schwartz had not "articulate[d] the reasons for such limitations"

and that the limitations were supposedly "not supported or consistent with the record as a

whole."  (R. at 18.)  This was not sufficient, where the Record could be read to have supported

Dr. Schwartz's opinions.  Similarly, the ALJ failed to seek clarification from Plaintiff's

remaining recognized treating physician Dr. Dynof,[48] who had opined that Plaintiff had suffered

from an overall loss of range of motion in his left shoulder.  Rather than attempt to clarify what

this "overall loss" may have meant for Plaintiff's functional abilities, the ALJ simply discounted

Dr. Dynof's opinion on the grounds that it was "vague" and lacked a specific functional

assessment.  (*Id.* at 15.)  Again, this was insufficient.

These errors have effectively precluded the Court from conducting a meaningful review

of the ALJ's decision, and they cannot be said to have been harmless.  Accordingly, remand is

warranted for further administrative proceedings.

### A.    The Insufficiency of the ALJ's Determination, at Step Three, That Plaintiff's Impairments Did Not Meet or Equal a Listing

As noted above (*see* Discussion, *supra*, at Section II(A)), the ALJ determined that

Plaintiff's impairments did not meet the requirements of Listing 1.02 (Major Dysfunction of a

Joint) or Listing 1.04 (Disorders of the Spine).  The ALJ did not provide any real explanation for

these determinations, beyond stating that Plaintiff had not demonstrated that he met each

Listing's criteria.

In his memorandum, Plaintiff does not specify which Listing is applicable to this action,

but, given that he devotes much of his argument to identifying the evidence in the Record that is

relevant to Listing 1.04(A), he appears to suggest that it was the ALJ's consideration of this

Listing that was flawed.  (*See* Pl. Mem., at 10-11.)  Similarly, Defendant has focused on why the

Record purportedly supports the ALJ's determination that Plaintiff's severe impairments did not

---

[48] As the ALJ noted in his decision, Plaintiff's other treatment provider, Dr. Harvey, was a chiropractor and, thus, not a recognized medical source under the regulations (*see* R. 18).  *See* 20 C.F.R. §§ 404.1502, 404.1513, 404.1527(a)(2); *Diaz v. Shalala*, 59 F.3d 307, 314 (2d Cir. 1995) (explaining that "the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him").

satisfy Listing 1.04(A).  (*See* Def. Mem., at 17-18.)  Upon independent review of the Record, the

Court finds that the only potentially applicable Listing (and corresponding subpart) is Listing

1.04(A).[49]

> In relevant part, this Listing identifies, as disabling conditions:

>> Disorders of the spine (e.g., herniated nucleus pulposus, spinal
>> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc
>> disease, facet arthritis, vertebral fracture), resulting in compromise
>> of a nerve root (including the cauda equina) or the spinal cord.

>> With:

>> A. Evidence of nerve root compression characterized by neuro-
>> anatomic distribution of pain, limitation of motion of the spine,
>> motor loss (atrophy with associated muscle weakness or muscle
>> weakness) accompanied by sensory or reflex loss and, if there is
>> involvement of the lower back, positive straight-leg raising test
>> (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).  To satisfy Listing 1.04(A), it is the plaintiff's

burden to "demonstrate that [his] disability [meets] 'all of the specified medical criteria' of a

spinal disorder."  *Otts v. Comm'r of Soc. Sec.*, 249 Fed. App'x 887, 888 (2d Cir. 2007)

(Summary Order) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) and citing *Rosa*, 168

F.3d at 77).  "[A]n impairment that manifests only some of those criteria, no matter how

severely, does not qualify."  *Sullivan*, 493 U.S. at 530 (citation omitted).

> Here, conflicting medical evidence left unaddressed by the ALJ renders the Court unable

to conclude that the ALJ's decision that Plaintiff failed to satisfy Listing 1.04(A) was supported

---

[49] As described above (*see supra* at n.45), Listing 1.02 requires a showing of the
claimant's inability to ambulate effectively, meaning that the claimant suffers from an "extreme
limitation of the ability to walk."  Examples of ineffective ambulation include "the inability to
walk without the use of a walker, two crutches[,] or two canes."  20 C.F.R. Pt. 404, Subpt. P,
App. 1, Listing 1.00B2b.  Plaintiff does not argue that he has met this criterion, and nothing in
the Record suggests that he has.  Thus, the Court agrees with Defendant that substantial evidence
supports the ALJ's determination that Listing 1.02 was not met or equaled in this case.

by substantial evidence.  *See Singleton v. Astrue*, No. 08cv2784 (SCR) (PED), 2009 WL

6325521, at *6 (S.D.N.Y. Aug. 13, 2009) (where the court's review of the medical evidence

indicated that ALJ's decision was not supported by substantial evidence, the decision was subject

to remand for further clarification on whether plaintiff met the requirements of Listing 1.04, or

for an explanation as to why plaintiff did not meet the requirements), *report and*

*recommendation adopted*, 2010 WL 1328976 (Apr. 5, 2010).

### 1. There Is Evidence in the Record of a "Disorder" Potentially Capable of Meeting the Threshold Requirement of the Listing.

As an initial matter, Defendant concedes that Plaintiff has met his burden of making the

threshold showing that is needed for Listing 1.04 (as stated above, evidence of a "[d]isorder[] of

the spine (e.g., herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis,

degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve

root (including the cauda equina) or the spinal cord"), as the Record contains diagnostic imaging

showing evidence of disc herniations, spinal stenosis (*i.e.,* narrowing), and nerve root irritation –

"disorders" included within the Listing.  (*See* Def. Mem., at 18 (citing R. at 192, 224, 836, 845).)

This threshold showing, however, does not end the inquiry – the Court must then look to the

Subpart (A) criteria and the evidence in the Record.

### 2. Evidence in the Record Potentially Capable of Satisfying the Subpart (A) Criteria

Following the threshold showing, Listing 1.04(A) requires the satisfaction of four

additional sub-criteria:  (1) "[e]vidence of nerve root compression characterized by neuro-

anatomic distribution of pain," (2) "limitation of motion of the spine," (3) "motor loss

(atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or

49

reflex loss," and (4) "if there is involvement of the lower back, positive straight-leg raising test

(sitting and supine)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).

   With respect to these four sub-criteria, Plaintiff points to evidence in the Record that he

had disc herniations in both the cervical and lumbar spine, which were "impressing on the spinal

cord"; that he had a cervical disc herniation that was flattening the spinal cord, resulting in

central spinal stenosis; that he had been diagnosed with cervical and lumbar radiculopathy and

was found to have lumbosacral nerve root irritation; that he had been diagnosed with a reduced

range of motion in both the cervical and lumbosacral spine; that he had experienced diminished

motor loss in both his cervical and lumbar spine, along with sensory loss; and that he had

repeatedly had positive straight leg tests.  (*See* Pl. Mem., at 10-11.)  Defendant, on the other

hand, argues that, in its view, there is "no evidence" in the Record of "actual nerve root

compression," which, "in turn resulted in atrophy, or sensory or reflex loss," as required under

Listing 1.04(A).  (Def. Mem., at 18.)

   In many respects, these issues are markedly similar to issues that were presented in

another Social Security case that was before this Court:  *McIntosh v. Berryhill*, No. 17cv5403

(ER) (DF), 2018 WL 4376417 (S.D.N.Y. July 16, 2018), *report and recommendation adopted,*

2018 WL 4374001 (S.D.N.Y. Sept. 12, 2018).   In *McIntosh*, this Court concluded that the ALJ

had failed to address conflicting evidence in the record that was relevant to the question of

whether Listing 1.04(A)'s sub-criteria could be found to have been satisfied.  *See id* at *18-23.

Considering the medical evidence in the Record under the four-part framework utilized in

*McIntosh*, the Court reaches the same conclusion here, for essentially the same reasons.

### a.      Nerve Root Compression With Pain

First, the Record in this case contains evidence that, during the period when he was insured, Plaintiff was diagnosed with cervical and lumbar radiculopathy, which involve the nerve roots and inflammation of the nerves.  (*See* R. at 734, 802-03, 809-10, 851.)  In particular, in June 2015, Dr. Dynof diagnosed Plaintiff with right lumbar radiculopathy (*id.* at 802-03), and then, in December 2015, Dr. Dynof recorded that Plaintiff suffered from left and right cervical radiculopathy (*id.* at 809-10).  Similarly, Dr. Schwartz found, in both October and December 2016, that Plaintiff suffered from probable underlying cervical and lumbosacral radiculopathy. (*Id.* at 851.)  Consistent with this, Dr. Kaci, the consultative examiner, who examined Plaintiff on only one occasion in August 2016, also diagnosed him with "chronic lower back pain, with radiculopathy."  (*Id.* at 734.)

This Court explained in *McIntosh* that "a diagnosis of radiculopathy [can serve] as a basis for satisfying the first sub-criterion."  *McIntosh*, 2018 WL 4376417, at *20 (citing *Norman v. Astrue*, 912 F. Supp. 2d 33, 78 (S.D.N.Y. 2012) for the proposition that lumbar radiculopathy can evidence nerve root compression).  Here, however (as in *McIntosh*), the ALJ did not address this diagnosis at Step Three.  As the Record reflects that Plaintiff was repeatedly found to have radiculopathy during the relevant period, the Court finds that the ALJ could have determined, from this apparently persistent condition, that the first sub-criterion was met for the necessary 12 months.

### b.      Limitation of Motion of the Spine

The second sub-criterion of Listing 1.04(A) is "limitation of motion of the spine." Although, in summarizing Dr. Dynof's treatment notes, the ALJ wrote that Plaintiff "consistently only showed slight reductions in range of motion testing" (R. at 15), the Court finds that much of

the Record actually suggests that Plaintiff suffered from a more significant, and consistent, restricted range of motion in both his cervical and lumbosacral spine.  For almost the entire closed period, Dr. Dynof recorded that Plaintiff's range of motion was restricted (*see id.* at 798, 800, 805 813, 822-23, 830, 1137, 1145-46), and, in June 2017, Dr. Dynof noted that, over the prior two years, Plaintiff had lost 40 percent in extension, left flexion, and right flexion in his lumbosacral range of motion (*id.* at 1131).  Further, from June 2015 through September 2016, Dr. Harvey consistently documented, after each visit, that Plaintiff had restricted range of motion and spasms in both his cervical and lumbar spines.  (*Id*. at 738-795, 926-1064.)  And, in May 2017, Harvey wrote that it was "clear that [Plaintiff] continue[d] to suffer from significant levels of loss of range of motion in all levels of his cervical and lumbar spine 23 months after the accident" and that, in his opinion, these range-of-motion findings were "significant and permanent in nature."  (*Id.* at 922.)  Based on this medical evidence in the Record, the Court finds that the ALJ could have determined that the second sub-criterion was also met.

### c.  <u>Motor Loss With Sensory or Reflex Loss</u>

The third sub-criterion of Listing 1.04(A) is "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss."  *See* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.04(A).  Like the medical evidence presented in *McIntosh*, the Record here contains conflicting evidence as to whether this requirement was satisfied.

First, as to motor loss, the medical evidence indicates that, in the immediate months after the accident, Plaintiff exhibited some loss of motor function. (*See*, *e.g.,* R. at 919 (Dr. Harvey noting in June 2015 that there was inflammation and tenderness in Plaintiff's joints and that his "[m]otion palpation revealed restricted motor units in each area of his spine.").)  These findings, however, were not always consistent, and in August 2016, Dr. Depuy recorded, after his

examination of Plaintiff, that he did not detect any motor loss.  (*See id.* at 1070.)  Still, in

August 2016, the consultative examiner Dr. Kaci did reportedly find that Plaintiff could not walk

on his toes due to his lower back pain and had difficulty walking on his heels, which, the Court

notes, may indicate motor loss and muscle weakness.  (*Id.* at 731-32; *see* 20 C.F.R. Pt. 404,

Subpt. P, App. 1, § 1.00(E)(1) (noting that "significant motor loss" may be shown by an

"[i]nability to walk on the heels or toes, to squat, or to arise from a squatting position"); *see*

*also Olechna v. Astrue*, No. 08cv398, 2010 WL 786256 at *6 (N.D.N.Y. Mar. 3, 2010) (adopting

report and recommendation) (noting that "[p]laintiff's muscle weakness was also documented in

his inability or difficulty with heal and toe walking")).  The ALJ here (like the ALJ in *McIntosh*)

did not address, let alone resolve, these conflicting findings, in the context of his consideration

of Listing 1.04(A), or explicitly draw any inferences from them, and he should have explained

whether, taken as a whole, the Record did, or did not, show motor loss for a 12-month period, as

necessary to satisfy this Listing requirement.

Second, with respect to either sensory or reflex loss – one of which is also necessary to

satisfy the third sub-criterion, *see* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.04(A); *Schieno v.*

*Colvin*, No. 15cv0335 (GTS), 2016 WL 1664909, at *6 (N.D.N.Y. April 26, 2016) – the Record

reflects that, in June and August of 2015, Dr. Harvey recorded that Plaintiff was experiencing

numbness/tingling in his lower back.  (*See* R. at 934-35, 962.)  Then, in October 2016,

Dr. Schwartz found diminished sensation in Plaintiff's right arm and leg.  (*See id.* at 849

(referring to Plaintiff's "referred pain, numbness and tingling into the right arm/leg").)  At that

time, Dr. Schwartz recorded that Plaintiff's ability to sense "light touch" or "pinprick[s]" had

"diminished" at "C5, C6, L4, [and] L5 dermatomes," and that Plaintiff's "[d]eep tendon

reflexes" were at "2/4 throughout [his] bilateral upper extremities."  (*Id.* at 850).  These same

findings were made again in December 2016.  (*See id.* at 845-46.)  Yet, at around this same time, neither Dr. Kaci nor Dr. Depuy indicated in their consultative reports that Plaintiff was experiencing any sensory diminishment; indeed, Dr. Depuy wrote in August 2016 that Plaintiff's "sensory and reflexes" appeared "intact."  (*Id.* at 1070.)

Although the ALJ stated, in his decision, that Plaintiff's impairments did not meet the requirements of Listing 1.04(A) (*id.* at 12-13), the ALJ failed to reconcile, or even address, any of the above-mentioned evidence.  Further, while the medical evidence in the Record does largely indicate that Plaintiff's reflexes were normal (*see, e.g.,* at 1070), under the applicable SSA regulations, only sensory *or* reflex loss must be shown to satisfy Listing 1.04(A), not both.  *See* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.04(A); *see also Schieno*, 2016 WL 1664909, at *6.  Thus, even if the ALJ had found no need to reconcile conflicting evidence regarding Plaintiff's reflexes, this could not have ended the inquiry with respect to this criterion.

### d.      Positive Straight Leg Test

The final sub-criterion of Listing 1.04(A), where involvement of the lower back is implicated, is "positive straight-leg raising test (sitting and supine)."  20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.04(A).  While Defendant acknowledges that Plaintiff had positive straight leg tests on at least two occasions, Defendant nevertheless also points out that Dr. Kaci assessed a negative (*i.e.*, normal) result on Plaintiff's straight leg test in August 2016.  (Def. Mem., at 5, 10, 13.)

Defendant's description of the Record on this issue is incomplete:  the Court observes that the straight leg test was recorded as positive by Plaintiff's treaters on at least eight occasions during the relevant two-year period.  (*See* R. at 800, 807, 815, 822-23, 830, 839-40, 1137,

1145-46.).  Likewise, the consultant examiner Dr. Depuy wrote in August 2016 that Plaintiff had

tested positive on the straight leg test for back pain.  (*Id.* at 1070.)

Faced with this medical evidence, it was incumbent upon the ALJ to address the findings

reflected in Plaintiff's treaters' notes from 2015 to 2017 and to reconcile them with Dr. Kaci's

singular finding of a negative straight leg test; to the extent the ALJ found Dr. Kaci's finding to

be the most compelling, the ALJ should have explained his reasoning in reaching that

conclusion.

### 3.    Appropriateness of Remand

As this Court explained in *McIntosh*:

> When an ALJ fails to set out his reasoning as to why a Listing has
> not been met, remand is not necessarily required.  If "other
> portions of the ALJ's decision and the evidence before him
> indicate that his conclusion was supported by substantial
> evidence," then the court may uphold the decision.  *Berry*, 675
> F.2d at 468.  Where, however, the court is "unable to fathom the
> ALJ's rationale in relation to evidence in the record, especially
> where credibility determinations and inference drawing is required
> of the ALJ," *id.*, then the matter should be remanded for further
> explanation, *see, e.g., Perozzi v. Berryhill*, 287 F. Supp. 3d 471,
> 483 (S.D.N.Y. 2018) (collecting cases); *Rivera v. Astrue*,
> No. 10cv4324 (RJD), 2012 WL 3614323, at *11-12 (E.D.N.Y.
> Aug. 21, 2012) (remanding where ALJ had failed to provide
> specific rationale as to why plaintiff did not meet the listing
> requirements, and where the balance of the evidence did not permit
> the court to glean the ALJ's rationale).

2018 WL 4376417, at *22.

As in *McIntosh*, the ALJ's analysis at Step Three in this case provides the Court with no

insight as to why the ALJ chose to rely on certain evidence, which may have been inconsistent

with a finding that Plaintiff had a Listing-level impairment of sufficient duration to be considered

disabling, and not to rely on other evidence, which, to the contrary, would have supported a

finding of disability.  Further, the analysis contained in the ALJ's decision, at the other steps of

the sequential analysis, does not shed light on how he reached his determination at Step Three. (*See generally* R. at 13-21.)  In these circumstances, the Court is not persuaded by Defendant's assertion that substantial evidence supports the ALJ's finding that Plaintiff did not meet a Listing.  (*See* Def. Mem., at 18.)  Although such a finding may have been supportable, the Court finds that ALJ could not have made the Listing determination without resolving the conflicting evidence in the Record – a task he did not undertake.  *See Ridge v. Berryhill,* 294 F. Supp. 3d 33, 57-58 (E.D.N.Y. Mar. 30, 2018) (where the ALJ failed to explain why plaintiff did not meet the Listing requirements, the Commissioner's argument that the duration requirement was not met was unavailing, as the record evidenced persistence of symptoms past the 12-month period); *see also Crump v. Astrue*, No. 6cv1003 (NAM/DRH), 2009 WL 2424196, at *6 (N.D.N.Y. Aug. 5, 2009) (finding that, in the absence of an explanation of the conflicting evidence as to a Listing, the court could not reasonably infer that there was sufficient uncontradicted evidence in the record to provide substantial evidence for the conclusion that Plaintiff failed to meet Step Three).

This case must therefore be remanded, so that ALJ may resolve the conflicting evidence. If, in light of the Record as a whole, the ALJ should again conclude, upon remand, that the requirements of Listing 1.04(A) are not met, then he should provide an explanation as to why this is so, "and explain the credibility determinations and inferences he drew in reaching that conclusion."  *Ryan v. Astrue*, 5 F. Supp. 3d 493, 509 (S.D.N.Y. 2014) (citations omitted).

**B.    The ALJ Also Failed To Develop The Record, and He
Relatedly Failed To Adhere to the Treating Physician Rule.**

In the event the ALJ should, upon remand, adhere to his prior determination that

Plaintiff's impairments did not meet or equal a Listing, then the ALJ should take steps to develop

the Record and reweigh the medical opinion evidence from Plaintiff's treaters.

**1.    The ALJ Should Have Taken Steps To Seek Clarification From
Plaintiff's Treating Physicians before Discounting Their Opinions.**

As set out above, an ALJ, as a general matter, has an affirmative duty to develop the

record as a whole, even where the plaintiff is counseled, and the failure to do so is itself grounds

for remand.  *See Rosa v. Callahan*, 168 F.3d 72, 79, 82-83 (2d Cir. 1999).  This duty extends to a

plaintiff's treatment records as well as to treating physicians' medical opinions.  *See, e.g.,*

*Fontanez v. Colvin*, No. 16-CV-01300 (PKC), 2017 WL 4334127, at *25 (E.D.N.Y. Sept. 28,

2017); *Hooper v. Colvin,* 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016).  Even in cases where the

plaintiff does not argue that the ALJ failed to develop the record, the court "is nevertheless

obliged to conduct its own independent assessment of whether the ALJ properly discharged this

duty."  *Castillo*, 2019 WL 642765, at *7.

**a.    Dr. Schwartz**

First, as noted above (*see supra* at n.31), the parties do not dispute that the so-called

treating physician rule should be applied to the medical opinions of Dr. Schwartz.  In his

decision, the ALJ afforded "great" weight to Dr. Schwartz's opinion that Plaintiff could not

return to his past work and "some" weight to his opinion that Plaintiff was limited to lifting only

up to 10 pounds (R. at 18); the ALJ, however, afforded no weight to the opinions expressed by

Dr. Schwartz regarding the other functional limitations that he identified, including, *inter alia*,

Plaintiff's limited ability to utilize his left arm at/below shoulder level and Plaintiff's need for frequent breaks from both standing and sitting throughout the day (*see id.*).

As previously explained (*see* Discussion, *supra*, at Section I(D)), an ALJ is required to give controlling weight to a treating physician's opinion, or else give "good reasons" for the weight that is given, 20 C.F.R. § 404.1527(c)(2); *see Ross v. Colvin*, No. 6:16-CV-06618 (MAT), 2018 WL 947267, at *5 (W.D.N.Y. Feb. 20, 2018) ("A corollary to the treating physician rule is the so-called 'good reasons rule,' which provides that the SSA 'will give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion."). Here, the supposed "good reason" that the ALJ provided for discounting Dr. Schwartz's opinions as to Plaintiff's remaining functional limitations (*i.e.*, all other functional limitations identified beyond the 10-pound lifting restriction), was that Dr. Schwartz had not provided "a well-reasoned analysis or articulate[d] the reasons for such limitations and those limits [were] not supported or consistent with the record as a whole." (R. at 18.) It is well established that this type of "conclusory" explanation "does not fulfill the ALJ's obligation under the treating physician rule." *Crutch v. Colvin*, No. 14-CV-3201 (SLT), 2017 WL 3086606, at *8-9 (E.D.N.Y. July 19, 2017) (rejecting what was essentially the same explanation offered by an ALJ to discount a treating physician's opinion).

More specifically, insofar as the ALJ determined that Dr. Schwartz's findings of Plaintiff's functional limitations were not "consistent" with the Record, it was the ALJ's responsibility to provide "specific citations to the medical record identifying specific portions that [were] inconsistent," because, otherwise, the Court cannot "properly review [his] decision." *Id.* at *8. Also, an ALJ's statement that a treating physician "failed to provide support for his opinions without an explanation" is not a good reason for rejecting them, as "the fact that a

physician left [his] opinion unexplained . . . does not mean that it is not well supported by medically acceptable clinical and laboratory diagnostic techniques and thus not entitled to controlling weight . . . [n]or does it mean that [his] opinion is unsupported by medical signs and laboratory findings." *Collins v. Berryhill*, No. 17-CV-00467, 2019 WL 2287787, at *4 (W.D.N.Y. May 28, 2019) (internal quotation marks and citation omitted).  If the ALJ was concerned that Dr. Schwartz's opinion lacked proper clinical foundation or was otherwise unsupported, then the ALJ was obligated to follow up with him before merely rejecting or discounting his opinion.  *Ruiz v. Comm'r of Soc. Sec.,* No. 18cv09659 (SDA), 2020 WL 728814, at *11-13 (S.D.N.Y. Feb. 13, 2020).

Notably, the only evidence in the Record that is obviously inconsistent with Dr. Schwartz's opinions regarding Plaintiff's functional limitations – particularly Plaintiff's inability to utilize his left arm at/below shoulder level and his need for frequent breaks during the workday – is Dr. Kaci's assessment, which the ALJ accorded "some" weight.  (R. at 16.)  While a consulting physician's opinion may, in some cases, override those of a treating physician, this should not be one of those cases.  Unlike Dr. Schwartz (and Dr. Dynof), Dr. Kaci, a family medicine practitioner, is not a specialist in a field related to Plaintiff's injuries, and she examined Plaintiff only once in the context of his Workers' Compensation claim.  *See Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination").  Moreover, Dr. Kaci's opinion of Plaintiff's physical limitations also lacked specificity, and consisted, in relevant part, of a single sentence that Plaintiff had "mild limitations to sitting; and moderate limitations to standing, walking, lifting, carrying, pushing, and pulling."  (R. at 16.)  This type of "vague" consultative opinion was insufficient to undermine the opinion of Dr. Schwartz.  *See Martinez v. Colvin*, No. 13-CV-0834 FB, 2014 WL

2042284, at *3 (E.D.N.Y. May 19, 2014) (vague consultative opinions describing a claimant's limitation in terms such as "mild" or "moderate" are insufficient to undermine the opinion of a treating physician).

In sum, if, in the ALJ's view, Dr. Schwartz's opinions were not adequately supported by the Record, then the ALJ should have explained this.  Moreover, to the extent the ALJ concluded that Dr. Schwartz's opinions were not adequately explained, he should have requested the explanation that was lacking.  In light of the ALJ's duty to develop the Record, it was error for him to reject Dr. Schwartz's opinions regarding Plaintiff's functional impairments without first reaching out to the doctor to obtain clarification of the bases of those opinions.

### b.    Dr. Dynof

Although not discussed by the parties, the Court also notes that the ALJ committed a similar error, when he failed to seek clarification from Plaintiff's other treating physician, Dr. Dynof, before discounting his opinions as well.  (*See* R. at 15.)  The ALJ wrote that he was discounting the opinions of Dr. Dynof – Plaintiff's longest-serving, recognized treating source – for the reasons that it was "vague" and lacked a "specific function-by-function work assessment."  (*Id.*)  Yet, there is no suggestion in the Record that the ALJ ever contacted Dr. Dynof to clarify any vagueness, or to solicit a function-by-function assessment, if necessary to evaluate the opinions that were proffered.

As for "vagueness," "[t]he law is clear beyond cavil that where, as here, a treating physician's opinion is found by the ALJ to be vague or unclear, it is incumbent on the ALJ to recontact the treating physician for clarification of his or her opinion."  *Isernia v. Colvin*, No. 14-CV-2528 (JEB), 2015 WL 5567113, at *10 (E.D.N.Y. Sept. 22, 2015); *see, e.g., Westfall v. Saul*, No. 18-CV-1243L, 2020 WL 1189918, at *3-4 (W.D.N.Y. Mar. 12, 2020) ("The ALJ's dismissal

of Dr. Nead's opinion as 'vague,' and failure to consider any of the factors relevant to the evaluation of a treating physician's opinion is error."); *Sanchez v. Comm'r of Soc. Sec.*, No. 18cv02027 (KMK), 2019 WL 4673740, at *7 (S.D.N.Y. Sept. 25, 2019) (vagueness alone is not a good reason to afford less than controlling weight to treating physician's opinion given the ALJ's duty to develop the record); *Page v. Colvin*, No. 15cv00792 (KNF), 2015 WL 9660016, at *5 (S.D.N.Y. Dec. 10, 2015) (the ALJ committed reversible legal error because he did not develop the record to resolve the issue of "vagueness" concerning plaintiff's treating physician's report, which lacked a functional capacity assessment regarding plaintiff's exertional limitations on her ability to meet the strength demands of sedentary work).

As for the lack of a supporting function-by-function assessment, the ALJ could have considered, as a preliminary matter, whether Dr. Dynof's stated opinions were consistent with – and supported by – the functional assessment that was separately provided by Dr. Schwartz.  If the ALJ found that a further functional assessment was still needed from Dr. Dynof because his opinions were not adequately focused on Plaintiff's functional work limitations, then he should have solicited a medical source statement from him that included such an assessment.  *See, e.g., Santiago v. Commissioner of Soc. Sec.*, 413 F. Supp. 3d 146, 157 (E.D.N.Y. 2018) (stating that, where necessary, the ALJ needed to "request a function-by-function statement" from the "doctors who may have treated [p]laintiff"); *Crysler v. Astrue*, 563 F. Supp. 2d 418, 435 (N.D.N.Y. 2008) (explaining that "the ALJ was dutybound to recontact" plaintiff's treating source "to obtain an assessment concerning plaintiff's RFC").

As with the case with Dr. Schwartz, the ALJ's failure to seek clarification from Dr. Dynof appears to have gone directly to the ALJ's ability to determine the appropriate weight to give to a medical opinion that, ordinarily, should have been accorded controlling weight, or at

least greater weight than the opinions of non-treaters.  *See, e.g.*, *Gonzalez*, 113 F. Supp. 2d at

589.  Ultimately, if the ALJ believed that Dr. Dynof's opinion could not be properly evaluated

because it was "vague," or lacked a necessary functional assessment, then the ALJ should have

taken additional measures to follow up with Dr. Dynof, rather than discount the opinion.  The

ALJ's failure to do so was error.

### 2.      The Failure To Develop the Record Was Not Harmless.

The ALJ's failure to develop the Record as to the opinions of both Dr. Schwartz and

Dr. Dynof cannot be characterized as harmless error.

As an initial matter, it is not for the Court to decide, in the first instance, (1) the extent to

which further clarification from both treating physicians as to Plaintiff's functional limitations

would or would not have supported their opinions, (2) the weight to be accorded to those

opinions, in light of further clarification, or (3) the result of weighing all of the opinion evidence,

in total, if different weights were to be assigned to those two opinions, in particular.  *See*

*Garcia v. Colvin*, No. 14cv3725 (DF), 2015 WL 5786506, at *26 (S.D.N.Y. Sept. 29, 2015)

("Where remand is appropriate because the ALJ failed to apply the correct legal principles, the

Court should not, prior to remand, attempt to assess whether substantial evidence in the [r]ecord

supports the ultimate disability determination.").

In any event, the Court finds that, had these treating physicians' opinions been given

greater weight by the ALJ, the ALJ may well have found Plaintiff to be disabled.  Dr. Schwartz

opined that, in addition to the need to avoid lifting objects that were more than 10 pounds,

Plaintiff needed to "refrain from using the affected [left] arm at/or below shoulder level" and

"reaching overhead in a repetitive manner," and that he should "use the affected [left] arm only

occasionally, as needed."  (*Id.* at 851.)  In addition, Dr. Schwartz opined that Plaintiff would

need to take "frequent breaks" from both standing and sitting throughout the day.  (*Id*.)  Nothing in the RFC the ALJ assigned to Plaintiff addressed the "at/or below shoulder level" exertional limitation – a functional limitation that was also supported by Dr. Dynof's separate assessment that there had been "a permanent loss of overall motion" in Plaintiff's left shoulder.  (*Id.* at 1132 (emphasis added).)  Likewise, Dr. Schwartz's opinion that Plaintiff would need "frequent breaks" was not reflected in the RFC, even though such a limitation, in particular, could well have impacted the ALJ's determination of disability.

As the VE explained at the Hearing, the sample jobs she identified as being capable of being performed by a person with the RFC assigned to Plaintiff could *not* be performed by a person who would be off-task for 20 percent of a workday.  (*Id.* at 146.)  Although, without clarification, it is uncertain what Dr. Schwartz may have meant by "frequent," the DOT defines "frequent" to mean "1/3 to 2/3 of [the] day"[50] – suggesting that Dr. Schwartz may have been intending to say that Plaintiff would likely be off task for more than 20 percent of the workday.  Thus, if given controlling weight, Dr. Schwartz's opinion, especially when read in conjunction with Dr. Dynoff's corroborative assessment, could have led to the finding that Plaintiff would *not* actually be able to hold the types of jobs that the ALJ apparently found him capable of performing under the assigned RFC.

Indeed, even if the ALJ had given the treating physicians' opinions even somewhat more weight, it is possible that the opinion evidence, overall, would then have weighed in favor of a finding of disability.  Ultimately, part of an ALJ's affirmative duty to develop the record includes seeking clarification from medical sources, particularly treating physicians, to address a

---

[50] *See SSA Physical Demands Classification v2*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/oidap/Documents/SSA%20Physical%20Demands%20Classification%20v2.ppt (accessed Sept. 17, 2020).

claimant's functional work limitations; the ALJ did not satisfy that duty here.  As both of these opinions would not have been "merely duplicative" of the other evidence before the ALJ (as there was no other recognized treating source opinion in the Record), and as it is "reasonably possible" that such opinion evidence, had it been available to the ALJ, could have influenced his decision, the Court finds that the failure to retrieve the necessary clarification from Plaintiff's treating physicians was not harmless error.

The Court therefore Orders that if, upon remand, the ALJ maintains his view that Plaintiff did not meet or equal a Listing for the relevant period, then the ALJ should seek clarification from Dr. Schwartz regarding Plaintiff's functional limitations, particularly his ability to utilize his left arm at/below shoulder level and his need for frequent breaks, and should also seek clarification from Dr. Dynof regarding his opinion about Plaintiff's overall loss of range of motion in his left shoulder.  The ALJ should then reconsider the weight that should be assigned to Dr. Schwartz's and Dr. Dynof's opinions and reevaluate Plaintiff's RFC in light of any reweighing of the opinion evidence.

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion (Dkt. 11), which the Court construes as a motion for judgment on the pleadings in his favor, is granted to the extent it seeks remand for administrative proceedings, and Defendant's cross-motion for judgment on the pleadings (Dkt. 15) is denied.

This case is hereby remanded for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  Upon remand, the ALJ is directed:

> (1)      to reevaluate whether, for the relevant period, Plaintiff's impairments met or equaled the requirements of Listing 1.04(A), in light of the Record as a whole and the conflicting evidence relevant to the criteria of that Listing,

and, if the ALJ adheres to his original determination that the Listing was not met or equaled, then to explain the basis for that determination, with reference to the evidence cited herein; and

(2)     if the ALJ continues to find that Plaintiff is not disabled based on Listing 1.04(A), then:

(a)     to reassess the weight that should be assigned to the opinions of treating physicians Dr. Schwartz and Dr. Dynof, after seeking clarification of their opinions with regard to (i) their assessed limitations of Plaintiff's use of his left arm and shoulder, and (ii) Dr. Schwartz's assessment that Plaintiff would need to take frequent breaks from both standing and sitting positions; and

(b)     upon reweighing the medical opinion evidence, to reconsider Plaintiff's RFC, and, if necessary, to recall the VE for additional testimony to evaluate whether Plaintiff's reassessed RFC would have precluded employment for Plaintiff during the relevant period.

In light of this Order, the Clerk of Court is directed to close Dkts. 11 and 15 on the Docket of this action, and to enter judgment in Plaintiff's favor, directing remand.

Dated:  New York, New York
        September 23, 2020

SO ORDERED

_____
DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)